UNITED STATES of America, Appellee,

v.

Diane SABATINO, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Joseph SABATINO Defendant,
Appellant.

Nos. 90–2191, 90–2192.

United States Court of Appeals,
First Circuit.

Heard April 5, 1991.

Decided Aug. 15, 1991.

Rehearing Denied Sept. 23, 1991.

Richard Abbott, for appellant Diane Sabatino.

Jeffrey A. Denner, Denner & Associates, for appellant Joseph Sabatino, with whom Marie Elena Saccoccio, was on brief.

Margaret D. McGaughey, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty. and Thimi R. Mina, Asst. U.S. Atty., were on brief for appellee.

Before BREYER, Chief Judge, BOWNES, Senior Circuit Judge, and TORRUELLA, Circuit Judge.

TORRUELLA, Circuit Judge.

During 1988 and 1989 appellants Joseph Sabatino and his wife Diane, a former prostitute, operated a number of escort services in the State of Maine which had clients in New Hampshire and Massachusetts and accepted payments through American Express. On March 14, 1990, a federal grand jury returned an eleven count indictment charging Joseph Sabatino with seven instances of knowingly causing, aiding and abetting the transportation of individuals across state lines for purposes of prostitution in violation of the Mann Act, 18 U.S.C. §§ 2421 & 2422, and three counts of aiding and abetting the use of a facility in interstate commerce (the American Express collection process) to promote, manage, establish, carry on and facilitate prostitution in violation of 18 U.S.C. §§ 1952(a) & (b) and 18 U.S.C. § 2. The first count of the indictment also charged Diane Sabatino and her husband with conspiracy to commit these two offenses in violation of 18 U.S.C. § 371. After three days of trial, the jury found both appellants guilty on all counts. The Sabatinos appeal both their convictions and their sentences. We address each challenge in turn.

## I

The Sabatinos present four grounds on which to reverse their convictions. Diane presents three on her own behalf, specifically: that the district court erred in refusing to grant her motion for severance; that she was convicted on the basis of insufficient evidence; and that a particular violation of Fed.R.Evid. 403 & 404(b) warrants a new trial. Moreover, both Joseph and Diane submit that the district court's incorrect charge to the jury caused them to be convicted of a crime which did not actually exist. We address these matters in turn.

### *Denial of Motion for Severance*

■ In determining the propriety of trying two or more defendants together, we must initially look to Fed.R.Crim.P. 8(b). Rule 8(b) provides that defendants may be tried together "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions, constituting an offense or offenses." *See United States v. Sutherland,* 929 F.2d 765, 778 (1st Cir.1991). Even where joinder is proper under the rule, however, a defendant may still obtain a severance if he or she can show that substantial prejudice, amounting to a miscarriage of justice, would result from a joint trial. *United States v. Perkins,* 926 F.2d 1271, 1280 (1st Cir.1991). Since the decision to grant or deny severance is a matter committed to the sound discretion of the trial judge, we will interfere with the trial court's determination only upon a showing of manifest abuse. *United States v. Martínez–Vidal,* 922 F.2d 914, 922 (1st Cir.1991).

■ In her attempt to establish prejudice, Diane submits that the prosecution's two most damaging witnesses, prostitutes Leola Sirois and Kelly Cook, failed to even mention her during their testimony. Sirois was 19 years old when she was assigned a prostitution call by Joseph Sabatino which resulted in her being abducted and held for twenty-four hours. When she explained to Joseph what had happened, he responded initially with laughter, then anger at the fact that she had missed a number of other calls. Cook, age 20, was brutally raped when Joseph assigned her to a regular customer named Mike Vaccaro. From Vaccaro she learned that Joseph had billed her as a "girl that looked as a Las Vegas showgirl and ... liked it rough." When Cook confronted Joseph with this information, he first demanded his share of the fee, then showed total indifference towards her situation. Diane claims that the horrifying nature of these experiences, Joseph's indifferent attitude toward them, and the dangers of guilt by association, impeded the jurors from determining her culpability fairly, impartially and solely on the basis of the evidence admissible against her.[1]

The problem with Diane's argument is this. Although the evidence she cites primarily depicts Joseph's participation in the illegal venture, it was nevertheless also admissible against her under a basic tenet of traditional conspiracy theory, namely, that a conspirator is responsible for acts his or her co-conspirators executed during the existence and in furtherance of the conspiracy. *United States v. Crocker,* 788 F.2d 802, 806 (1st Cir.1986); *United States v. Cranston,* 686 F.2d 56, 62 (1st Cir.1982). While this evidence might have been susceptible to a Fed.R.Evid. 403 analysis, *see United States v. Shenker,* 933 F.2d 61, 63 (1st Cir.1991), even under such a prism we do not deem its prejudicial value to have outweighed its probativeness. Moreover, in its final instructions the court stressed to the jury, as counsel for both sides had already done in closing, its obligation to consider the evidence against each defendant separately, *see United States v. Boy-*

---

1. Additionally, Diane complains that she was prejudiced from the incompetent performance of her husband's trial counsel in eliciting particular portions of the government witnesses' plea agreements. Sixth Amendments rights, however, are personal in nature and cannot be asserted vicariously, even by a co-conspirator spouse. *Gannett Co. v. DePasquale,* 443 U.S. 368, 380, 99 S.Ct. 2898, 2905–2906, 61 L.Ed.2d 608 (1979). And, in any event, we have held that informing the jury of the contents of a plea agreement of "normal stripe" is not error. *United States v. Martin,* 815 F.2d 818, 821 (1st Cir. 1987).

*lan,* 898 F.2d 230, 246 (1st Cir.1990), thereby adequately safeguarding against any "spillover" effect, *see United States v. Silvestri,* 790 F.2d 186, 189 (1st Cir.1986). Diane's claim of prejudice thus boils down to a complaint that she was tried with a more culpable defendant. But, as we said in *Martínez–Vidal,* 922 F.2d at 923:

> "[P]rejudice means more than just a better chance of acquittal at a separate trial." *United States v. Martínez,* 479 F.2d 824, 828 (1st Cir.1973). Incidental prejudice, such as that which is almost always encountered when multiple defendants playing different roles are tried together, will not suffice. *United States v. Cresta,* 825 F.2d 538, 554–555 (1st Cir.1987), *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988).

Finally, we note that the joinder clearly satisfied the requirements of Fed.R.Crim.P. 8(b), since both defendants were alleged to have participated in the same series of acts or transactions constituting the offenses.

All circumstances considered, then, the trial court's denial of severance did not constitute manifest abuse.

### *Sufficiency of the Evidence*

 On appeal, we look at the evidence in the light most favorable to the prosecution, drawing all legitimate inferences and resolving all credibility conflicts in its favor. *United States v. MacDonald & Watson Oil Co.,* 933 F.2d 35, 40 (1st Cir.1991). Analyzed from that perspective, the verdict will be upheld if any reasonable trier of fact could have found the elements of the offense beyond a reasonable doubt. *United States v. Mena,* 933 F.2d 19, 23 (1st Cir.1991). Diane was charged with conspiracy to commit two offenses, to wit, aiding and abetting the transportation of individuals across state lines for purposes of prostitution, and using the American Express accounts to facilitate the commission of that crime. To convict, the jury was required to find that she knowingly agreed to violate these federal laws and that at least one overt act was perpetrated in furtherance of that agreement. *United States v. Yamin,* 868 F.2d 130, 133 (5th Cir.1989).

Far from being the innocent bystander she portrays herself to be, the evidence presented at trial established that Diane Sabatino played an active role in the prostitution ventures operated by her husband, particularly an escort service operated from Warren Avenue in Westbrook, Maine called "Classic Escort and Massage." Married to the Classic Escort's President, Diane was the company's Vice–President, its second ranking officer, and herself an experienced prostitute. She helped to interview most of the prostitutes who later testified against her and actively discussed effective prostitution techniques with them. Diane lived on the business premises and shared an office with her husband, thus situating herself in a position from which she could oversee and participate in all of the business operations. Several of the prostitutes testified to the fact that Diane was one of the two people (the other one being her husband Joseph) empowered to call American Express for payment authorizations and from whom they had to obtain approval on credit card slips for tips. (Records seized from the company premises demonstrated that Classic Escort collected $39,000 through American Express). A logbook containing the names and numbers of Boston area clients, which was in Diane's handwriting and which she admitted to an FBI agent she maintained, was seized from behind her desk and introduced into evidence, thus proving Diane's awareness of, and her active supervisory involvement in, the interstate aspects of this prostitution ring. Moreover, Diane later became the license holder for "Diana's Health Club," a facility operated by her husband which, although not advertised as a prostitution service, regularly put clients in contact with girls who were willing to have sex for a fee.

The evidence also showed that Diane was the resident trainer, coach and psychological counsellor for the company's employees. For example, when 21–year–old Leslie Ann Tardiff was interviewed by the Sabatinos and confessed to her lack of experience in the escort field, Diane took her into another room for graphic individual instruction with an actual customer. More-

over, when Andrea Ross, the company's 19-year-old secretary, expressed anxiety over the prospect of her first prostitution assignment, Diane gave her significant points of advice. When Ross' apprehension persisted, Diane assured her that it would be easier after the first few times. Diane similarly assuaged Jenny May Buzzell's fears about a particular customer with her personal experience that the customer was easy and that, before she would know it, the encounter would be over. Although Buzzell was a 27-year-old woman with prior experience in prostitution, at one point during her months of employment with the Sabatinos she became distraught over the nature of her occupation, prompting Diane to advise her not to think of what she was doing as sex but simply as another job.

Against this overwhelming evidence of her active role in the conspiracy, Diane claims she should not have been convicted because she did not assign any of the prostitutes to out-of-state calls. Diane, however, need not have personally assigned any out-of-state calls to be convicted on the conspiracy charge. The essence of the conspiracy crime is the agreement, *see United States v. Rivera–Feliciano*, 930 F.2d 951, 955 (1st Cir.1991); *Ianelli v. United States*, 420 U.S. 770, 777 n. 10, 785 n. 17, 95 S.Ct. 1284, 1289 n. 10, 1293 n. 17, 43 L.Ed.2d 616 (1975), and an aiding and abetting charge only requires proof that the defendant associated herself with the venture, that she participated in it as something that she wished to bring about, and that she sought by her actions to make it succeed, *United States v. Mehtala*, 578 F.2d 6, 9 (1st Cir.1978). In any event, the record shows that Diane's participation was not as passive as she now characterizes it. Tardiff, for instance, remembered that in January of 1989 Diane and Joseph both sent her to Boston to recruit new prostitutes and service calls channeled through an answering service. Moreover, Ross' first sexual encounter, the one that required Diane's coaching, took her to New Hampshire. The jury could also have reasonably inferred from Diane's continuous presence on the premises and the closeness of the organization that she was privy to most of the out-of-state prostitution assignments.

Our review of the evidence thus shows that Diane assumed an active and insidious role in her husband's criminal venture, and that the motion for judgment of acquittal was therefore correctly denied.

### Fed.R.Evid. 403 & 404(b)

Thirdly, Diane submits that the erroneous admittance into evidence of testimony directed at establishing that Joseph instructed the company's secretary to place a newspaper advertisement with a telephone number to call for "adult talk," violated Fed.R.Evid. 403 & 404(b) and constituted reversible error. Even assuming that the error was in fact committed, we hardly pause in concluding that, given the overwhelming proof of Diane's participation in the conspiracy, the "error" was harmless. *See United States v. Rodriguez–Cardona*, 924 F.2d 1148, 1152 (1st Cir.1991) (Rule 404(b) error ruled harmless where independent evidence against appellant was overwhelming). We therefore reject this contention without further discourse.

### Motion to Strike

■ The Sabatinos join forces to argue that the district court incorrectly instructed the jury when it allowed the word "cause" to appear in its definition of the offense of transporting individuals across state lines for purposes of prostitution, with the result that they were convicted for non-existent crimes. Reading the record, however, we find that before the district court charged the jury on the Mann Act it accommodated the Sabatinos' request that the word "cause" be eliminated from its instructions "to reflect the 1986 amendments to 18 U.S.C. § 2421." The only remaining concern was that the word "cause" still appeared in the indictment, which the district court refused to strike. Thus, the scope of our review is a limited one: whether such inclusion caused reversible error. The inclusion of a particular wording on the indictment requires reversal only if it is improper and misleads appellants to their

prejudice. *United States v. Potes*, 880 F.2d 1475, 1477 (1st Cir.1989).

Since at the core of the Sabatinos' argument is a misunderstanding regarding three of the provisions of law they were charged with violating, specifically, 18 U.S.C. §§ 2, 2421 and 2422, we begin with a brief exposition of the conduct proscribed by each of these three statutes.

Before 1986, 18 U.S.C. § 2421 punished: Whoever knowingly transports in interstate ... commerce ... any woman or girl for the purpose of prostitution or debauchery ... or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute ... or

Whoever knowingly procures or obtains any ticket or tickets, or any form of transportation ... to be used by any woman or girl in interstate ... commerce ... in going to any place for the purpose of prostitution ... or with the intent or purpose on the part of such person to induce, entice or compel herself to give herself up to the practice of prostitution ...[.]

After the 1986 amendments, § 2421 read: Whoever knowingly transports any individual in interstate or foreign commerce ... with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, shall be fined under this title or imprisoned not more than five years, or both.

As a comparative reading of these two versions reveals, the 1986 amendments to the Mann Act simply made it extensive to interstate prostitution of males as well as females, and added the requirement that the "debauchery" previously described be punishable as a criminal act. By its own terms, then, § 2421 plainly and simply pro-

hibits the knowing transportation of individuals across state lines with the intent that they engage in sexual activity for which they could be charged with a criminal offense. Most notably, the word "cause" did not appear in the pre–1986 version of § 2421, and neither did the 1986 amendment impose a requirement that a violator must personally transport the prostitute across state lines to be convicted.[2] Thus, in charging the jury, the district court correctly deleted the word "cause" from its description of 18 U.S.C. § 2421.

Does it logically follow from the above that the word "cause" should also have been deleted from the indictment? The answer is *no* and the reason is simple: the source of the word "cause" in the indictment was not the Mann Act but, rather, the aider and abettor statute, 18 U.S.C. § 2. That statute reads:

Whoever willfully *causes* an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal (emphasis ours).

This provision allows a conviction for a substantive crime even when the defendant was not present or did not personally commit all of the requisite acts establishing the offense. One reason for its enactment was to permit the language "causes and procures" to be deleted from a variety of substantive offenses, such as the Mann Act. *Jones*, 909 F.2d at 539–40. This generic statute "removes all doubt" that one who sets an illegal course in motion but intentionally refrains from "the direct act constituting the completed offense" shall not escape punishment. *See* H.R.Rep. No. 304, 80th Cong., 1st Sess. A5 (1947); *see also Jones*, 909 F.2d at 540–41. It is important to emphasize that an aider and abettor charge is implicit in all indictments for sub-

**2.** In *United States v. Jones*, 909 F.2d 533 (D.C.Cir.1990), the District of Columbia Circuit interpreted the provisions of the Mann Act in terms which we find illustrative for our present purposes. While noting that "one need not physically carry or accompany a person interstate in order to 'transport' her; it may be enough effectively to cause her to be transported," that court stated that the more natural reading of § 2421 confines it to cases in which

the defendant personally or through an agent performed the proscribed act of transporting. *Id.* at 540. Reading it any other way would render 18 U.S.C. § 2422, which applies to "those cases in which the defendant provides the motivation, ranging from persuasion to coercion, but the person 'travels' under her own steam, without need of anyone to 'transport' her," redundant. *Id.*

stantive offenses, so it need not be specifically pleaded for an aiding and abetting conviction to be returned. *United States v. Stitzer*, 785 F.2d 1506, 1519 n. 7 (11th Cir.1986); *United States v. Pearson*, 667 F.2d 12, 13 (5th Cir., Unit B, 1982). The fact that in this case both its language and its citation were specifically invoked, however, is the source of no consequences.

Thus, we conclude that both the instructions to the jury and the language of the indictment were proper, and that the appellants were not prejudiced thereby in any way. The district court's treatment of the matter was therefore impeccable.

## II

The base offense level ("BOL") of all the counts of conviction for both Joseph and Diane was 14. Adjustments made for appellants' use of coercion in the commission of the offense, United States Sentencing Commission, *Guideline Manual*, § 2G1.1 (Nov.1990) (hereinafter, "U.S.S.G."), for their leading roles, U.S.S.G. § 3B1.1(a), for targeting vulnerable victims, U.S.S.G. § 3A1.1, and for obstruction of justice, U.S.S.G. § 3C1.1 (only to Joseph's sentence), as well as application of U.S.S.G. § 3D1.4 (multiple counts) to Joseph's case, yielded an offense level of 29 for Joseph and 24 for Diane. Joseph was consequently sentenced to 108 months imprisonment, a three-year term of supervised release, a $25,000 fine and a $50 felony assessment. Diane was sentenced to 60 months imprisonment, a two-year term of supervised release, a $5,000 fine and a $50 felony assessment. The Sabatinos now challenge each and every adjustment made to their BOLs by the sentencing court.

### Obstruction of Justice

■ The sentencing court added two levels to Joseph Sabatino's BOL for obstruction of justice under U.S.S.G. § 3C1.1. Guideline § 3C1.1 directs a sentencing court to add two offense levels if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation or prosecution" of the offense. The commentary to § 3C1.1 lists the "threatening, intimidating, or otherwise unlawfully influencing [of] a co-defendant, witness, or juror, directly or indirectly, or attempting to do so" as an example of conduct to which the enhancement applies. U.S.S.G. § 3C1.1, comment. (n. 3(a)). In the instant case, the sentencing court found that Joseph attempted to obstruct the administration of justice in this manner on two separate occasions. Mindful that the government need only prove the occurrence of these incidents by a preponderance of the evidence, *United States v. Marino*, 936 F.2d 23, 30 (1st Cir.1991), we follow well-established precedent in reviewing the sentencing court's fact-based determinations only for clear error. *United States v. Wheelwright*, 918 F.2d 226, 228 (1st Cir. 1990).

The first of Joseph's attempts to obstruct justice came when he told Cook, in response to her refusal to talk to him before trial, that she would "end up taking a one-way walk through the woods." A plainly reasonable interpretation of Joseph's remark was that unless Cook conformed her version of the events to Joseph's interests, she would be killed. Contrary to Joseph's contention, the witness to this statement was not unknown, as Cook testified to the conversation at trial and was available for cross-examination. An independent basis for the obstruction of justice enhancement was Joseph's statement to Scott Murray, a 21–one year old employee of Classic Escort who had served Joseph as a bodyguard, driver, masseur, and as a male escort to add men to the line of women. Shortly before Murray was to appear before the grand jury, Joseph warned him that he would "get his." It was reasonable to construe this as a threat that if Murray gave evidence of Joseph's involvement in interstate prostitution, Joseph would do the same to Murray as he threatened to do to Cook, a transparent effort to intimidate a witness which constitutes an independent basis for the enhancement. While Joseph offered an alternative interpretation for the remark, "matters of credibility are normally for the trial court, not this court, to decide," *Wheelwright*, 918

F.2d at 228, and the sentencing court's interpretation does not rise to the level of clear error.

Finally, Joseph submits that this testimony was "suspect" within the meaning of § 3C1.1 and should therefore have been "evaluated in the light most favorable to the defendant." U.S.S.G. § 3C1.1. However, as our *Wheelwright* decision and the subsequent 1990 amendments to the Sentencing Guidelines make clear, this language "most likely refers, not to 'suspicious' testimony, but rather to testimony given by a 'suspect,' *i.e.* by the defendant himself in court under circumstances where a judge might (after conviction) find it tempting to impose an 'obstruction' increase on the ground that the defendant had lied on the witness stand." *Wheelwright*, 918 F.2d at 229. We therefore leave the two-level enhancement to Joseph's BOL for obstruction of justice undisturbed.

### Leading Role

 The sentencing court additionally increased both of appellants' BOLs by four levels for their leading role in the commission of the offense. Under U.S.S.G. § 3B1.1(a), two requirements must be met for a four-level increase based on a defendant's leading role in the commission of the offense to be forthcoming. First, the sentencing court must conclude that the defendant acted as "an organizer or leader of a criminal activity" and, secondly, that the criminal activity "involved five or more participants or was otherwise extensive." *United States v. McDowell*, 918 F.2d 1004, 1011 (1st Cir.1990); *United States v. Preakos*, 907 F.2d 7, 9 (1st Cir.1990). *See also United States v. Fuller*, 897 F.2d 1217, 1220–21 (1st Cir.1990) (§ 3B1.1 does not apply to defendant who merely organizes or supervises a criminal activity executed without the aid of others, but must involve an exercise of some degree of control over others or some responsibility for organizing others for the commission of the offense). The non-exhaustive list of factors to be considered by the sentencing court in making this determination include: the exercise of decision-making authority; the nature of the participation in the commission of the offense; the recruitment of accomplices; the claimed right to a larger share of the fruits of the crime; the degree of participation in planning the offense; the nature and scope of the illegal activity; and the degree of control exercised over others. *See* U.S.S.G. § 3B1.1 (commentary); *Preakos*, 907 F.2d at 9; *Fuller*, 897 F.2d at 1220–21. Since role-in-the-offense determinations are fact-specific, we examine them under the clearly-erroneous standard of review. *United States v. Wright*, 873 F.2d 437, 444 (1st Cir.1989); *Fuller* 897 F.2d at 1219–20; *McDowell*, 918 F.2d at 1011.

The fact that Joseph and Diane were the organizers or leaders of a pervasive interstate prostitution ring cannot be the subject of serious dispute. Nothing would be gained by reemphasizing at this point the substantial nature of Joseph and Diane's participation in this illegal enterprise, so we simply refer the reader to our review of the evidence regarding Diane's sufficiency claim. Moreover, the evidence presented at trial established that the criminal venture involved more than five participants. At its peak, Classic Escort alone had between fifteen and thirty employees. The Sabatinos themselves could be counted as participants, *see Preakos*, 907 F.2d at 10, and we have already described the experiences of at least five more prostitutes (Tardiff, Sirois, Cook, Buzzell and Ross) who testified at trial. Additionally, "Diana's Health Club" had its own employees, some of whom, such as exotic dancer Timothy Doucette, also testified at trial. Direct evidence also implicated a driver by the name of Hank Grant, a masseuse named Lori Chase, and two additional prostitutes simply called Dawn and Wanda. The pervasive nature of the enterprise, servicing clients in three states, would also bring it within the "otherwise extensive" language of § 3B1.1(a).

Against the weight of this evidence, Joseph and Diane argue that the adjustment was improper because not all employees worked in their business at the same time and not all engaged in interstate prostitution. However, as the commentary to

**102**

§ 3B1.1 makes clear, in counting the number of participants, "all persons involved during the course of the entire offense are to be considered." U.S.S.G. § 3B1.1, comment. (n. 2). Thus, we conclude that the adjustment made to appellants' sentences under § 3B1.1(a) for their leading role in the commission of the offense was proper.

### Vulnerable Victim & Coercion

■ The sentencing court also tacked on two levels to both of appellants' BOLs pursuant to U.S.S.G. § 3A1.1 because their criminal activity allegedly targeted vulnerable victims, and four more levels pursuant to U.S.S.G. § 2G1.1 because their use of these alleged victims presumably involved coercion. Under § 3A1.1, a sentencing court is directed to increase the BOL by two levels if "the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly vulnerable to the criminal conduct." Under § 2G1.1, the sentencing court is directed to raise the BOL by four levels if the offense "involved the use of physical force, or coercion by threats or drugs or in any manner." See United States v. Plaza–Garcia, 914 F.2d 345, 347 (1st Cir.1990). The district court found that the fact that many of the prostitutes employed by the Sabatinos were single, teenage mothers in need of a job made them unusually vulnerable and represented elements of coercion which warranted a more severe punishment. We vacate both adjustments, albeit for different reasons, which we now proceed to expound.

Starting with the "vulnerable victim" adjustment, we must accept, as caselaw requires, the sentencing court's findings of fact regarding the prostitutes' personal circumstances. See United States v. Polanco–Reynoso, 924 F.2d 23, 24 (1st Cir.1991). It is the sentencing court's interpretation of the guidelines as applied to the facts of this case which gives us pause. Of course, a sentencing court's legal interpretation and application of the sentencing guidelines is subject to plenary review. See United States v. Martinez, 931 F.2d 851, 852 (11th Cir.1991). And, we find that the sentenc-

ing court's interpretation of § 3A1.1 was inaccurate.

The sentencing guidelines lay out the punishments that are to be imposed to those persons found to have violated the federal criminal codes. A straightforward application of the guidelines generally results in the imposition of severe punishments, and the guidelines also allow for adjustments and departures to account for circumstances not already taken into consideration or envisioned by the Sentencing Commission in setting its penalties. Appellants in this case were convicted of the crime of transporting individuals across state lines for purposes of prostitution, the so-called Mann Act, 18 U.S.C. §§ 2421 & 2422, for which the sentencing commission prescribed a base offense level of 14. In considering whether to adjust or depart from the applicable base offense level, then, the relevant question was whether in light of the particular circumstances of their case the Sabatinos should have received an additional punishment over and above the severe punishment already set by the sentencing guidelines because, compared to the ordinary Mann Act violators, the conduct they engaged in was somehow more culpable. In other words, the sentencing court had to determine whether the Sabatinos' conduct was worse than the typical instance of the crime. To answer this, we first turn briefly to examine precisely what conduct is proscribed by the Mann Act, 18 U.S.C. §§ 2421 et seq.

The Mann Act was enacted in the early 1900s in response to growing Congressional concern for what many believed to be a widespread practice: commercial procurers taking young girls and women and forcing them into lives of prostitution and vice. Note, The White Slave Traffic Act: The Historical Impact of a Criminal Law Policy on Women, 72 Geo.L.J. 1111, 1112 (1984). Although subsequent judicial interpretations of the Act extended its application to other situations, see Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917) (allowing prosecutions in noncommercial cases); United States v. Holte, 236 U.S. 140, 35 S.Ct. 271, 59 L.Ed.

504 (1915) (permitting women to be convicted of conspiracy to violate the Mann Act), and the law has been recently amended to reach instances of child sexual abuse, *see United States v. Ellis*, 935 F.2d 385, 391–92 (1st Cir.1991), the statute's original and primary concern with the protection of the victims remained unchanged. In fact, in *Wyatt v. United States*, 362 U.S. 525, 530, 80 S.Ct. 901, 904, 4 L.Ed.2d 931 (1959), the Supreme Court stated:

> As the legislative history discloses, the [Mann] Act reflects the supposition that the women with whom it sought to deal often had no independent will of their own, and embodies, in effect, the view that they must be protected against themselves.

The Act was enacted amidst reports that the importation of illegal aliens for prostitution and other immoral purposes (or white slave traffic, which was in fact its original name) was a most troubling aspect of the immigration problem. *See Report Before Congress by the U.S. Commissioner General of Immigration on the Repression of the Trade in White Women*, S.Doc. No. 196, 61st Cong., 2d Sess. (1909). Moreover, it was not intended to regulate voluntary prostitution (responsibility for which remained with the individual states), but to prevent "panderers and procurers" from compelling women and girls against their wills and desires to engage in prostitution. *See* H.R.Rep. No. 47, 61st Cong., 2d Sess. (1909). Thus, the Act embodied a paternalistic attitude concerned with the protection of women and girls who, because of their innocence, their hard lives and their vulnerability, were particularly susceptible to becoming victims of unscrupulous men and women who would take advantage of their situation for immoral purposes. Given this background, an adjustment for vulnerable victims under U.S.S.G. § 3A1.1 would have been proper only if the young women employed as prostitutes by the Sabatinos were "unusually vulnerable," that is, "unusually vulnerable" given the kind of victim that is typically involved in a Mann Act violation and that Congress aimed to protect. The sentencing court's task was therefore to evaluate the evidence to determine what, if anything, was special about these girls that would distinguish them from the typical individuals who would fall prey to a Mann Act violator.

Looking to the record, we find that the circumstances on which the sentencing court presumably relied to find that the Sabatinos' victims were unusually vulnerable were basically three: that the youngest of the prostitutes were 18 years of age, that two of them were mothers of small children, and that many of them were out of work. At oral argument, the government stressed that these circumstances, collectively considered, allegedly created an economic dependency which made them specially vulnerable to the Sabatinos and on which the Sabatinos played to commit their crimes. There is no basis in the record, however, which would have allowed the sentencing court that a typical victim of a Mann Act violation is generally not otherwise out of work, or does not normally have small children, or whether at 18 years of age they would have been of an unusually low age. In fact, as the legislative history of the Mann Act evinces, quite the opposite seems closer to the truth. The enhancements made to appellants' BOLs for vulnerable victims must therefore be vacated.

Turning to the adjustment for coercion, we also accept, as we again must, the sentencing court's findings of fact regarding the Sabatinos' superior bargaining power and the victims' economic dependency. *Polanco–Reynoso*, 924 F.2d at 24. And, we also find, under the same standard of review, *see Martinez*, 931 F.2d at 852, that the sentencing court's interpretation of § 2G1.1 was off the mark. A brief explanation follows.

In making the adjustments to appellants' BOLs under § 2G1.1, the sentencing court found that the young girls involved in this case were "practical psychological prisoners of [the] enterprise" because their economic needs, and the way in which the Sabatinos took advantage of these economic needs, made it practically impossible for them to abandon their trade. However, while it is true that coercion includes "any

form of conduct which negates the voluntariness of the person transported," *see* U.S.S.G. § 2G1.1, comment. (n. 2), we have some reservations about accepting as coercion the type of economic pressures which existed in the case at bar. First and foremost, there was ample evidence in the record that the men and women employed as prostitutes by the Sabatinos could quit at any time and that many in fact did do so. Secondly, we are of the opinion that aside from those rare cases where the coercion consisted of the involuntary ingestion of drugs or hallucinogens to induce a person into committing a crime, coercion must at a minimum involve, conceptually speaking, an impending threat of some negative consequence that will affirmatively befall a person if he or she does not succumb to the pressure that is being exerted. The simple fact that there was money to be made from engaging in prostitution, which could then be used for purchasing drugs or for other purposes, cannot be said to have "negate[d] the voluntariness of" these girls in the above-mentioned way. To the contrary, the money to be made from participating in this criminal venture was, in the troubling atmosphere which permeates all offenses involving prostitution, a welcomed consequence of their conduct, not a negative one which forced them into that type of behavior. And, after all, in just about any crime which involves payment for the criminal conduct, the bottom line always is that if the person does not commit the crime, he or she will not get the money. Thus, counting as a form of coercion the fact that there is an economic advantage to be gained from committing the crime would in fact increase the punishments for every financially motivated crime.

Also misplaced is the sentencing court's reliance for a coercion adjustment on the alleged theme of physical violence which permeated the record. Admittedly, there was evidence to the effect that the Sabatinos sent problem prostitutes to a particularly violent customer named Manwarning as a form of punishment. Moreover, we have already noted how several of the assignments resulted in the prostitutes being either abducted or brutally raped, and how the Sabatinos showed total indifference toward these incidents. However, these violent acts were not used as coercive elements to force the girls to participate in the criminal venture. To the contrary, the only rational effect they could have had was to persuade the girls to abandon this line of work. Thus, even under this alternative ground, the adjustments for coercion cannot stand.

### III

In view of the foregoing, appellants' convictions are *affirmed.* The enhancements to their sentences made under U.S.S.G. §§ 3B1.1(a) & 3C1.1 are *affirmed* and those made under U.S.S.G. §§ 2G1.1 & 3A1.1 are *vacated.* As a result, Diane Sabatino is to be sentenced at the higher end of BOL 18 and Joseph Sabatino at the higher end of BOL 23.

*Remanded to the district court for further proceedings consistent with this opinion.*