# United States Court of Appeals
## For the First Circuit

No. 99-1558

UNITED STATES OF AMERICA,

Appellee,

v.

TROY FOOTMAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Selya, Boudin, and Lynch,
Circuit Judges.

Jonathan Shapiro, with whom Stern, Shapiro, Weissberg & Garin was on brief, for appellant.
Paula J. DeGiacomo, Assistant U.S. Attorney, with whom Donald K. Stern, United States Attorney, and Diana K. Lloyd, Assistant U.S. Attorney, were on brief, for appellee.

June 16, 2000

**LYNCH, <u>Circuit Judge</u>**.  A jury convicted Troy Footman of various federal crimes on evidence that he was a pimp, running a ring of prostitutes who were transported across state lines from Massachusetts to Delaware.  Footman was convicted of one count of conspiring to transport women, including three minors, across state lines for the purpose of prostitution, in violation of 18 U.S.C. § 371; four counts of transporting minors across state lines for the purpose of prostitution, in violation of 18 U.S.C. §§ 2, 2423(a); one count of transporting an adult across state lines for the purpose of prostitution, in violation of 18 U.S.C. §§ 2, 2421; and twelve counts of using an interstate facility to distribute the proceeds of prostitution activities, in violation of 18 U.S.C. §§ 2, 1952(a)(1).  He was tried alone, although Kimyou Tes, one of the women involved in the prostitution ring, was described as a co-conspirator.[1]

---

[1]    The government originally charged Tes with conspiracy and charged her under a number of the substantive offense counts but dropped the charges after Footman was convicted.

Footman, ably represented by counsel, says his conviction must fall because the evidence was not sufficient to prove guilt beyond a reasonable doubt, the jury was not properly instructed, and some evidence -- Footman's own bragging and threatening statements in recorded telephone conversations from prison -- was improperly obtained. He also complains about the district court's sentencing that resulted, through several upward departures, in a sentence of 15 years, about twice the mandatory minimum. Counsel's arguments are not frivolous; but neither are they sufficient, and we affirm both the verdict and the sentence.[2]

This appeal requires that we resolve for the first time the issue of whether the Massachusetts prison system's practice of intercepting and recording inmate telephone calls violates Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510 et. seq. ("Title III"). It also requires further delineation of the distinction between being a mere victim of a conspiracy and being a co-conspirator.

**I**

---

[2] Footman has also filed a pro se brief, raising arguments that have no merit. We have considered them and there is no need to extend the discussion beyond the issues raised by counsel.

We recite the essential facts as a reasonable jury could have found them and in the light most favorable to the government.  See United States v. Bartelho, 71 F.3d 436, 438 (1st Cir. 1995).  A fuller description of the facts may be found in the district court's sentencing opinion.  See United States v. Footman, 66 F. Supp. 2d 83 (D. Mass. 1999).

Footman, assisted by Tes and another prostitute, Rita Boykins, ran a prostitution business that included three minors, S.O., age seventeen, A.M., age seventeen, and J-3, who was only fourteen years old.[3]  Footman recruited S.O. from a Massachusetts state courtroom, where he told her that, in order to get back custody of her infant daughter, she would need to earn money. She went to work as a prostitute in Chinatown and gave her money to Footman.  A.M. became a prostitute for Footman when she was sixteen years old and worked at the trade in Boston.  J-3, the 14 year old, was trained in how to be a prostitute in 1996 by another woman in Footman's menagerie, on his instructions "just to show her what to do and tell her it was fun."  J-3 could not

---

[3]    We refer to the eldest two girls using their initials, as the district court did. We refer to the youngest girl as J-3 (the term used to describe her in the indictment), as the district court did upon a motion by the United States to protect her identity.

go through with her first attempt at prostitution, and one of the other prostitutes told Footman she didn't feel that J-3 was right for it. Footman urged patience, and eventually J-3 successfully worked as a prostitute. Boykins, who was an adult during the periods relevant to Footman's convictions, also worked as a prostitute for Footman.

Beginning in the summer of 1996, the young women were transported to New Castle, Delaware, where they worked their trade at a truck stop and gave their earnings to Footman. They received about $10 a day for condoms and food. There were multiple trips to Delaware from late June or early July 1996 to March 1997, each trip typically lasting a few weeks. Although Footman did not always accompany the young women to Delaware, he would make appearances there for a few days at a time. Different prostitutes wired Footman the collective receipts, unless Footman was in Delaware, in which case the money was handed to him directly.

The June 1996 Trip

In late June or early July 1996 Footman told A.M. that they would be going to Delaware to work at a truck stop because things had gotten "hot" with the police in Boston. Footman

drove in one car, and A.M., Tes, and other prostitutes followed behind in a second car. Footman registered for rooms at the Budget Motel near the truck stop and took the young women to the truck stop to begin working. Footman told them what to charge for different sex acts, and they gave the money they earned to him.

The July/August 1996 Trip

A.M. and other prostitutes went to Delaware in late July or early August 1996, at Footman's direction. A.M. drove down in Footman's car with Tes. Footman did not accompany them on this trip. Tes registered the young women at the Budget Motel, listing Footman's car as their car. A.M. wired the money they made back to Footman. On one occasion, A.M. also wired money back to Tes.

After they had returned to Massachusetts, A.M. attempted to leave Footman. Footman responded by dragging A.M. out of her house into the backyard, beating her, and throwing her over a fence. He then forced her into a car driven by Tes and took the money she had made working for an escort service. They eventually ended up at Boykins's apartment, where Footman explained that things would be the "old way" -- that A.M. would

stay where Footman put her, would not have a boyfriend, would not speak to other pimps, and would give Footman all the money she made.

The October 1996 Trip

A.M., J-3, Tes, and other prostitutes drove to Delaware in October 1996. A.M. testified that they drove in Footman's car, but Boykins, who arrived later by bus, registered for rooms at the Budget Motel and listed Tes's Chevy Celebrity as the car they were driving.[4] Footman had told Boykins that the police weren't so bad in Delaware.

The night before A.M.'s birthday, Footman drove S.O. and another prostitute down to Delaware and dropped S.O. off. As he had previously done with A.M., Footman had told S.O. that things were "hot" in Boston with the police and that they would be going to Delaware to work at a truck stop. At Footman's direction, A.M. wired Footman the money she and the other young women had earned from prostitution. Boykins also wired money to Footman.

---

[4] Tes later transferred title of this car to Footman.

Although the date is not clear from the record, at some point A.M. and J-3, at Footman's direction, traveled by bus to Delaware to work at the truck stop. Footman paid for the bus tickets, and A.M. gave the money they made to Footman.

The November 1996 Trip

A.M., J-3, Tes, and other prostitutes traveled to Delaware in November 1996. Footman, Tes, and Boykins registered for rooms for different dates during the period from November 3 to December 16, 1996. A.M., Tes, and Boykins wired money to Footman during this time.

Some time in November, while in Delaware, S.O. tried to escape from Footman. At one point she was chased down by Tes and Footman, with Tes driving the car. Footman brought S.O. to a motel room and brutally beat and raped her.

The January 1997 Trip

A.M. and other prostitutes drove to Delaware again in January 1997. A.M. wired Footman the money they made from prostitution. Boykins also wired money to Footman from Delaware in January 1997.

A.M. left Delaware for about a month, traveling "down south" with a truck driver. When she returned to Delaware in February, she attempted to leave Footman to go to work for another pimp. When Footman found out, he beat A.M. She again agreed to work for him.

The March 1997 Trip

Boykins drove to Delaware with Footman in March 1997 and worked at the truck stop as a prostitute. They traveled in Footman's car, and Footman registered for the motel rooms. Recorded CB transmissions from March 14, 1997, show Boykins directing prostitution at the Delaware truck stop.

**II**

A. Sufficiency of the Evidence

Footman makes several arguments that the government's evidence was insufficient. The arguments require a careful roadmap of the counts of conviction. In addition to conspiracy

(count one of the indictment), Footman was convicted of five separate

substantive transportation offenses (counts three through seven of the

indictment). Specifically, he was convicted on count three

(transportation of A.M. in or about late July 1996, to in or about

early August 1996); count four (transportation of A.M. in or about

October 1996); count five (transportation of S.O. in or about October

1996); count six (transportation of J-3 in or about October 1996 and

November 1996); and count seven (transportation of Boykins in or about

March 1997).[5] In reviewing Footman's sufficiency claims, we view

the evidence in the light most favorable to the government,

drawing all legitimate inferences and resolving all credibility

conflicts in its favor. See United States v. Sabatino, 943 F.2d

94, 97 (1st Cir. 1991).[6]

1. Conspiracy (Count One)

Footman argues, correctly, that a conspiracy of one

person is no conspiracy at all. The government had charged him

---

[5]  Footman was acquitted on count two of the indictment
(transportation of A.M. in or about late June 1996 to in or about early
July 1996). He does not raise sufficiency of the evidence claims with
regard to his convictions on counts five and six.

[6]  The government argues that Footman failed to preserve his
sufficiency claims and that, as a result, our review is for "clear and
gross" injustice. United States v. Upham, 168 F.3d 532, 537 (1st Cir.
1999). Because we are able to affirm Footman's convictions under the
standard less burdensome to Footman, we do not address the issue of
whether Footman adequately preserved these claims for appeal.

with conspiring with Kimyou Tes, one of the prostitutes, to transport adults and three minors across state lines for the purpose of prostitution. But Tes was never tried and the charges against her were dismissed.[7] Footman says Tes was a mere victim and that a woman who simply prostitutes herself under the control of a pimp and consents to being transported across state lines cannot be a co-conspirator under the Mann Act. There is law to this effect. See Gebardi v. United States, 287 U.S. 112, 123 (1932) ("[W]e perceive in the failure of the Mann Act to condemn the woman's participation in those transportations which are effected with her mere consent, evidence of an affirmative legislative policy to leave her acquiescence unpunished."). Specifically, Footman argues that there was insufficient evidence that Tes ever entered any agreement with him to accomplish the goals of the conspiracy. See United States v. Colon-Munoz, 192 F.3d 210, 226 (1st Cir. 1999).

---

[7] Footman also complains about the government's "cynical" tactics in naming Tes as a co-conspirator and then dismissing the charges against her. The government's reasons, whether admirable, tactical, or cynical, were the stuff of prosecutorial discretion and do not raise any additional issues for consideration on appeal.

-11-

In support of the conclusion that "Tes was a mere victim," Footman relies most heavily on statements made by the trial judge at sentencing. The judge said:

> In the instant case, none of the women, with exception of Tes, was included in the indictment. Plainly, the indictment and the proof offered by the government, characterized the women and girls instead as victims, not participants. Everything I heard confirms this fact.
> Furthermore, although Tes was originally included in the indictment with Footm[a]n, charges against her were subsequently dismissed. Nothing I heard in the trial, or read in the parties' submissions persuades me that Tes was in a different category than the other women or girls. Thus, I find that there were no "participants" involved with Footman in these crimes . . . .

Footman, 66 F. Supp. 2d at 93. This argument based on the district judge's comments at sentencing is largely beside the point. The question of guilt was for the jury to decide, and to focus on what the trial judge said is to focus on the wrong actor at trial. See United States v. Pitocchelli, 830 F.2d 401, 403 (1st Cir. 1987).

The real question is whether the jury had adequate evidence to conclude that Tes was more than a victim -- that she was in fact a co-conspirator. The dividing line is an important one. There is an inherent policy judgment in the Mann Act not

-12-

to prosecute women who do no more than consent to being transported across state lines for the purpose of prostitution. But that policy simply does not apply when the women assume roles in running the business. Thus, in Sabatino this court upheld the conspiracy conviction of a wife who played an active role in two prostitution businesses her husband ran: an "escort service" and a "health club." Sabatino, 943 F.2d at 97-98; see also United States v. Anderson, 139 F.3d 291, 295-96, 298-99 (1st Cir. 1998) (affirming, in an appeal based upon other grounds, conviction of an adult prostitute for transporting a minor where the adult prostitute's car was used in transportation and where the adult prostitute purchased a train ticket for the minor). Footman says there is no evidence that Tes was a partner, received any income, made any agreements, or committed any acts in furtherance of the conspiracy. There was no evidence, he says, that she acted any differently from the others who were under his dominion and thrall. In particular, Footman says that the other prostitutes also registered for rooms and sent money back to him, as Tes did, and so she is indistinguishable.

It is true that many of Tes's actions were of the same

-13-

nature as the actions of some of the other prostitutes. That is not the crux; the issue is whether she agreed to further the conspiracy and took steps to do so, beyond her working as a prostitute herself and crossing state lines. There is ample evidence from which a jury could conclude that she acted as Footman's agent and co-conspirator. Tes, who lived with Footman, acted on Footman's behalf as transporter of the women, arranger of the details of the business, occasional money handler, and enforcer.

Tes transported A.M. and J-3 to Delaware. She registered for dozens of nights of stays by the group at motels in Massachusetts and Delaware. This was far in excess of the number of room registrations by the others. Importantly, unlike most of the other prostitutes, Tes had a driver's license and an ID. Footman himself did not have a driver's license until February of 1997. The license was important to the transportation scheme of driving the women to Delaware. A driver with a license was needed to continue the trip if they were stopped by the police. In addition, Tes owned (or, at least, allowed to be registered in her name) two of the

automobiles used for transportation -- a Chevy Celebrity and a Chrysler LeBaron.

Further, Tes acted as an enforcer. When A.M. attempted to free herself from Footman's control in September 1996, Tes assisted Footman in coercing her back into his employ. She also chased down S.O. in a motel parking lot in Delaware when S.O. was attempting to escape from Footman. This evidence, in the aggregate, was adequate to support the finding that Tes had agreed to the criminal scheme and had committed overt acts in furtherance of it.

## 2. Substantive Counts Three, Four, and Seven

Footman also argues that the evidence was insufficient to prove that he transported A.M. (counts three and four) or Boykins (count seven) across state lines for the purpose of prostitution.

As to A.M.'s several trips to Delaware, Footman says there is no evidence that he went with her or arranged for anyone else to transport her. But the evidence supports a finding that Tes was Footman's agent in transporting A.M. A.M. testified that she and other prostitutes went to Delaware in late July, with Tes, at Footman's direction. The women traveled

-15-

in Footman's car, and Tes registered for the motel rooms.  A.M. wired money back to both Footman and Tes.

A.M. testified that she, J-3, and other prostitutes drove to Delaware with Tes in October 1996.  The record evidence is that the group drove down either in Footman's car or in Tes's car.  Moreover, not long before this trip, Footman had beaten A.M., thrown her over a backyard fence, taken the money she earned working for an escort service, and told her that, from then on, she would stay where Footman put her and would give him all the money she made.

As to Boykins, she testified that Footman traveled with her to Delaware in March 1997.  Footman says there is no evidence that he exercised any control over her or that she went to engage in prostitution.  The trip was made in his car, and he registered for the rooms at the motel.  Boykins had prostituted for Footman in Delaware before this trip.  A jury could easily infer that this trip was for similar purposes.  Indeed, recorded CB transmissions show she was directing prostitution at the Delaware truck stop.

Overall, the evidence was sufficient to support the verdict.

-16-

B. <u>Jury Instructions</u>

Footman's argument that the jury instructions were legally erroneous is pertinent to his convictions on the substantive transportation counts. Our review is de novo. <u>See</u> <u>United States</u> v. <u>Woodward</u>, 149 F.3d 46, 68 (1st Cir. 1998).[8]

Footman was charged under two theories -- that he was a direct participant in the Mann Act violations and that he was an aider and abetter. Each theory has somewhat different requirements. For example, the direct theory under §§ 2421 and 2423(a) requires that Footman "knowingly transport[ed]" the women across state lines. 18 U.S.C. § 2421, 2423(a). The statutory language does not literally extend to "causing" the transportation. <u>See</u> <u>Sabatino</u>, 943 F.2d at 99. Under the aiding and abetting theory, by contrast, it would suffice that Footman "caused" the women to be transported across state lines for the purpose of prostitution. <u>See</u> 18 U.S.C. § 2(b).

The trial judge initially explained to the jury that it could convict Footman under either a direct participation

---

[8]    The government argues that Footman failed to object to the district court's final instructions and that, as a result, our review is for plain error. Because we find, upon de novo review, that the instructions given did not cause prejudice to Footman, we do not address the issue of whether Footman preserved this claim.

-17-

theory or an aider and abetter theory. She then defined "transport" under § 2421 as "to move or carry or cause someone to be moved or carried from one state to another." Moments later, the judge defined "knowing transportation" to include "cause to be transported."

The judge then went on to instruct that the § 2423(a) counts required proof of the same elements as § 2421, with the additional element that "the transportation needs to involve a minor." In giving the § 2423(a) instruction, the judge distinguished liability under the direct participant theory from liability for aiding and abetting. The instruction was as follows:

> In addition, then, to the two elements that I have described, that the defendant did knowingly transport or did counsel, command, induce, procure or cause the transportation of an individual, a named individual, in interstate commerce -- that's what I've summarized as the knowing transportation or causing to transport prong; two, that the defendant did so with the intent that the individual engage in prostitution or other illegal sexual activity . . . .

Footman claims that the judge's instructions allowed the jury to convict Footman "for conduct that was not criminalized by

-18-

§§ 2421 and 2423(a)." This argument is to no avail.[9] The trial judge properly instructed the jury on the difference between direct participation liability and liability as an aider and abetter. Any confusion generated by the judge's having defined "knowing transportation" under § 2421 to include "cause to be transported" was corrected by her proper instruction regarding § 2423(a).

Even if the earlier instructions defining "knowing transportation" were in error, there was no prejudice to Footman, as there is no "pure" theory of direct liability.[10]

---

[9] In his brief, Footman points to the trial judge's last instruction (the one including the "counsel, command, induce" language) in his claim that the trial judge erred in instructing the jury. That last instruction was a correct statement of the law, and it clearly articulated the elements for both the direct participation and the aiding and abetting theories of criminal liability. We assume Footman's argument that the trial judge committed error is really in response to her having defined "knowing transportation," on a number of occasions, to include "cause to be transported." These statements did not correctly describe the elements of § 2421. As already noted, "transport" in § 2421 does not include "causing" the transportation of an individual. See Sabatino, 943 F.2d at 99.

Footman may also be claiming that it was improper to instruct the jury on aiding and abetting liability at all. If so, this argument is without merit. Footman was charged under both the substantive statutory sections and the aiding and abetting statute, and the evidence put on by the government sufficed to allow the issue to go to the jury.

[10] A different situation might arise in a case where the prosecution's theory was that the defendant "caused" the prostitute to transport herself across state lines by persuading her to do so, whether by sweet talk, for a bonus, or the like. In such a case, the

-19-

"[A]n aider and abettor charge is implicit in all indictments for substantive offenses, so it need not be specifically pleaded for an aiding and abetting conviction to be returned." Sabatino, 943 F.2d at 99-100. As the revisor's note to § 2 states, "one who puts in motion or assists in the illegal enterprise . . . is guilty as a principal even though he intentionally refrained from the direct act constituting the completed offense." 18 U.S.C. § 2 revisor's note. When aiding and abetting is involved, then, the "counsels, commands, induces, or procures" and "cause" language from § 2 is properly part of the jury's instruction. Cf. United States v. Leppo, 177 F.3d 93, 95 (1st Cir.), cert. denied, 120 S. Ct. 501 (1999) (harmless error for trial judge to include "willfully causes" language from § 2(b) as part of definition of "transport" under statute criminalizing "transport[]" of stolen goods).

C. Admission of Footman's Recorded Telephone Calls

The district court admitted evidence in the form of recordings of telephone calls Footman made from prison to Tes

---

question of whether the "causation" involved would suffice to constitute knowing transportation under the substantive statutory sections is a real question. That was not the evidence or the government's theory here, and so we do not need to explore this nuanced meaning of the phrase "knowingly transport."

and others.  In those calls, Footman described himself as a pimp, threatened the women with harm if they revealed any information, and made statements that supported the government's version of the facts.  Footman says these calls were recorded in violation of Title III and that they should have been excluded as evidence.  We review the district court's fact findings for clear error and review its conclusions of law de novo.  See United States v. Beras, 183 F.3d 22, 25 (1st Cir. 1999).

At the state prison in Concord, Massachusetts, all inmate calls, except calls to designated attorneys, are recorded and subject to monitoring.  See Mass. Regs. Code tit. 103, § 482.  In order to use the phones, inmates are required to sign a form stating that they understand that their calls will be monitored and recorded.  Large stickers on the phones remind inmates that their calls are being recorded.  A third notice comes at the start of each call, when a pre-recorded message tells both parties to the call that "[a]ll call detail and conversation, excluding approved attorney calls, will be recorded."  Footman's calls were made in this context.

In civil prison conditions cases, this court has alluded to but not decided the issue of whether the interception

-21-

(and recording) of inmate calls violates Title III.  See Gilday

v. Dubois, 124 F.3d 277, 296-98 (1st Cir. 1997);  Langton v.

Hogan,  71 F.3d. 930, 935-37 (1st Cir. 1995).

The government introduced the calls on the theory that

they were consensual and so admissible under 18 U.S.C.

§ 2511(2)(c), which refers to "prior consent to such

interception."[11]  The government claimed that there was valid

consent from both parties to the telephone calls.  Footman had

signed the form giving his consent to recording as a condition

of making the calls, and, the argument went, the recipients of

the calls consented by accepting the calls after listening to

the recorded warning that the calls could be recorded.

It is settled law that only one party need consent to

the interception of the calls. See United States v. Pratt, 913

F.2d 982, 986-87 (1st Cir. 1990).  The district court held that

the recipient's consent was valid, but that the consent of the

prisoner was not.  See United States v. Footman, 33 F. Supp. 2d

60, 64 (D. Mass. 1998).  The result -- that there was a valid

_____

[11]    The government had another theory of admissibility: that the
calls were placed on telephone equipment being used in the ordinary
course of their duties by investigative or law enforcement officers.
See 18 U.S.C. § 2510(5)(a)(ii).  We do not reach this argument.

-22-

consent -- is correct, but our reasoning is different.  In our view, the consent of the prisoner is valid and there is no need to go further.  We do not reach the question of whether the other party to the call consented.

The question of consent, either express or implied, may vary with the circumstances of the parties.  See Griggs-Ryan v. Smith, 904 F.2d 112, 116-17 (1st Cir. 1990).  Footman does not make a Fourth Amendment argument, but raises a statutory question under Title III.  Here, Footman expressly acknowledged his understanding that his use of the prison telephones was conditioned on his calls being monitored and recorded.  Even express consents, though, may be treated as invalid under some circumstances, such as where they result from overriding coercion.  See 2 Wayne R. LaFave et al., Criminal Procedure §4.3(c), at 361 n.87 (2d ed. 1999).  In Langton, this court questioned whether consent could be premised upon an inmate's having to choose between making no phone calls and agreeing to have his phone calls recorded.  See 71 F.3d at 936.  Footman argues that this is the position he was in, and that it is Kafkaesque to say his consent was voluntary.  Footman urges that the government may not "condition access to even a gratuitous

benefit or privilege it bestows upon the sacrifice of a constitutional right."  Blackburn v. Snow, 771 F.2d 556, 568 (1st Cir. 1985).

In literal terms, Blackburn -- which involved consent to strip searches and thus violations of bodily integrity -- does not apply here.  Prisoners have no per se constitutional right to use a telephone, and the violation urged here is of a statute, not the Constitution.  Nonetheless, the argument by analogy must still be addressed as to whether extracting consent as a condition of access to a telephone call by a prisoner means the consent is not voluntary, and so is invalid.

Whatever the merits of that argument outside of the prison context, where privacy interests are stronger,[12] it has little force when the person giving consent is in confinement. Prison inmates have few expectations of privacy in their communications.  Cf. Hudson v. Palmer, 468 U.S. 517, 526-28 (1984).  There is no reason to think that Congress would not

_____

[12]    Title III itself explicitly considers that those engaged in oral communications may have reduced privacy expectations and assumes that there are protectable privacy interests in wire communications. See 18 U.S.C. § 2510(1), (2). We do not address whether those privacy interests are given up by a person, outside of the prison context, merely because she accepts a call that has been preceded by a phone company announcement that the call is being recorded.

-24-

have included within the meaning of consent a prison inmate's express acceptance of having his calls recorded as a condition of using the telephone.[13]  This is particularly so given the "deference and flexibility" federal courts afford state officials in managing prisons.[14]  Sandin v. Conner, 515 U.S. 472, 482 (1995).

Other circuits have reached this same conclusion -- that prison inmates in Footman's position have given their consent for purposes of Title III.  See United States v. Workman, 80 F.3d 688, 692-94 (2d Cir. 1996); United States v. Van Poyck, 77 F.3d 285, 292 (9th Cir. 1996); United States v. Horr, 963 F.2d 1124, 1126 (8th Cir. 1992). But see United States v. Daniels, 902 F.2d 1238, 1244-45 (7th Cir. 1990) (expressing reservations about finding Title III's consent requirement satisfied in this context).

---

[13]    In passing the legislation, Congress was concerned with protecting the privacy of individual citizens while providing for the effective use of electronic surveillance to combat organized crime. See S. Rep. No. 90-1097 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2153-63.  There is little reason to believe that Congress was concerned with the privacy interests of prison inmates.

[14]    There may, of course, be "occasional applications that might raise hard questions."  Langton, 71 F.3d at 941 (Boudin, J., dissenting).

There was no violation of Title III and no error in admitting the evidence.

D. Sentencing

Footman argues that the district court erred in departing upward under two provisions of the Sentencing Guidelines in determining his sentence.

1. Departure under U.S.S.G. § 4A1.3

The district court departed upward, at the government's request, under U.S.S.G. § 4A1.3 on the ground that Footman's Criminal History Category (CHC) of III did not "adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3  Footman's adjusted CHC was VI.

Footman says that the district court erred in adjusting his CHC upward based upon six unscored convictions for offenses he committed prior to age 18 and based upon five unscored adult convictions from more than 10 years before commencement of the present offenses.[15] We understand Footman to be arguing that the

---

[15]    Under U.S.S.G. §§ 4A1.2(d) and 4A1.2(e), Footman's juvenile convictions and his adult convictions from more than ten years prior to the present offenses (and that resulted in sentences of thirteen months or less) were not included in his initial CHC calculation.

district court committed an error of law by considering improper factors in making the departure. Our review is plenary. See United States v. Snyder, 136 F.3d 65, 67 (1st Cir. 1998).

In an attempt to provide guidance on this issue, the Sentencing Commission amended the Commentary to U.S.S.G. § 4A1.2 in 1992 to provide:

> If the court finds that a sentence imposed outside this time period is evidence of similar, or serious dissimilar, criminal conduct, the court may consider this information in determining whether an upward departure is warranted under § 4A1.3 (Adequacy of Criminal History Category).

U.S.S.G. app. C, amend. 472 (amending application note 8 of the commentary to § 4A1.2). According to the Sentencing Commission, "[t]his amendment clarifies that dissimilar, serious prior offenses outside the applicable time period may be considered in determining whether an upward departure is warranted under § 4A1.3." Id.

Footman says that despite this clear guidance from the Sentencing Commission, the district judge made no finding that the six juvenile and five adult convictions upon which she based the upward departure represented "similar, or serious dissimilar, criminal conduct."

Footman's argument does not capture what the district court actually did in its careful and attentive sentencing decision. The court observed that Footman's offenses were, in large part, serious; that they escalated; and that recidivism was characteristic. These were certainly adequate bases, permitted by the law, to conclude that his CHC was too low. Moreover, the Guidelines Commentary on which Footman relies is exemplary, not exclusive. For that reason, § 4A1.3 explains that evidence of an inadequate CHC "may include, but is not limited to," specifically enumerated categories. U.S.S.G. § 4A1.3; see also United States v. Brewster, 127 F.3d 22, 26 (1st Cir. 1997). All the section actually requires is that the judge's finding that the CHC is too low be based upon "reliable information." U.S.S.G. § 4A1.3. "[A] court should not infer from inexplicit Guidelines language, or from language that authorizes use of a particular factor as a basis for departure in some cases, an absolute barrier in principle against using certain other factors as grounds for departure in other unusual circumstances." United States v. Doe, 18 F.3d 41, 47 (1st Cir. 1994).

In addition to analyzing Footman's prior, unscored convictions, the trial judge focused on two other sources of information in determining whether the initial CHC was representative. First, the trial judge considered Footman's own bragging about how he had beaten previous charges and his plans to "pimp up again" after he beat the present charges. Second, the trial judge considered A.M.'s testimony regarding how Footman had intimidated her into not testifying against him after he had been charged with deriving support from a minor prostitute (A.M.). A.M. had even brought intimidation charges against Footman while he was in pre-trial detention for this offense and had sought a restraining order against him. The trial judge credited A.M.'s testimony that Footman had intimidated her into dropping her request for the restraining order and not testifying against him.

This is one area of the Guidelines where individualized attention to the defendant is encouraged. That this individualized attention worked to Footman's detriment is a function of his incorrigibility, not of an error by the district court.

2. <u>Departure Under U.S.S.G. § 5K2.4</u>

-29-

Footman separately argues that a second upward departure, pursuant to U.S.S.G. § 5K2.4, was error because the abductions of A.M. and S.O. (the rape and beating of S.O. in November 1996 and the beating of A.M. in February 1997) were not committed to facilitate the commission of an offense of conviction.

Whether the abductions were committed to facilitate the offenses for which Footman was convicted is a question of fact. We review the district court's fact findings at sentencing for clear error. See United States v. Li, 206 F.3d 78, 85-86 (1st Cir. 2000). We otherwise review the district court's decision to depart from the sentencing guidelines for abuse of discretion. See id.

The abductions postdate the transportation offenses forming the basis for the 18 U.S.C. § 2423(a) charge, Footman argues, and so cannot be counted. Because the trial judge could reasonably conclude that the abductions did facilitate criminal conduct for which Footman was charged and convicted, we need not decide whether an abduction that clearly postdates the criminal act for which a defendant is convicted could support a departure under § 5K2.4.

Footman was charged with and convicted of conspiracy to transport women (including minors) across state lines for the purpose of prostitution from in or about June 1996 until in or about April 1997. The abductions occurred during this period and clearly "facilitated" the commission of the conspiracy. Cf. United States v. Uccio, 940 F.2d 753, 760 (2d Cir. 1991) (affirming § 5K2.4 departure for kidnaping and assault of coconspirator). Further, Footman was charged with and convicted of a substantive transportation offense that occurred in March 1997. Because the abductions occurred prior to the commencement of that offense, the trial judge could reasonably conclude that they facilitated that offense. Footman did not commit either of the acts in private. The record evidence is more than sufficient to have allowed the trial judge to conclude that Footman carried out these attacks in front of other prostitutes in order to send a message. The district court committed no abuse of discretion in deciding to depart upward on this basis.

### III

We affirm Footman's conviction and sentence.