**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Roosevelt DANIELS, et al.,
Defendants–Appellants.**

Nos. 89–2014, 89–2015, 89–2017,
89–2025 and 89–3176.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 18, 1990.

Decided May 10, 1990.

Rehearing and Rehearing En Banc
Denied June 11, 1990.

Thomas M. Durkin, Asst. U.S. Atty., Lisa K. Osofsky, Victoria J. Meyers, Barry R. Elden, Asst. U.S. Attys., Crim. Receiving, Appellate Div., Chicago, Ill., for the U.S.

Jon K. Stromsta, Michael H. King, Kurt H. Feuer, Ross & Hardies, Chicago, Ill., for Roosevelt Daniels.

Chris Averkiou, Chicago, Ill., for Edward Fitzgerald.

Michael B. Cohen, Chicago, Ill., for Lawrence Lee.

Lawrence Lee, pro se.

Douglas P. Roller, Rooks, Pitts & Poust, Chicago, Ill., for Sandra Campbell.

Before CUMMINGS, POSNER, and MANION, Circuit Judges.

POSNER, Circuit Judge.

The five defendants whose appeals we have consolidated were charged with large-scale federal drug offenses orchestrated by defendant Daniels, in part through telephone calls to the other defendants from the Metropolitan Correctional Center in Chicago, where he was awaiting trial for his drug activities. The evidence of guilt being overwhelming, the defendants pleaded guilty, reserving however several issues for appeal. Later they moved to set aside their guilty pleas, but Judge Holderman denied the motion and in 1989 sentenced the defendants to prison for terms ranging up to 55 years (for Daniels). Although the sentences are exceedingly long (especially since they are not subject to parole), the defendants' offenses were brazen, far-flung, and enormously profitable.

█ The principal issue is the validity of the indictment. Section 3331 of the Criminal Code places an eighteen-month limit on the life of a federal grand jury, unless the district court enters an order extending it. An indictment issued by a grand jury whose term is up and has not been validly extended is void, *United States v. Bolton*, 893 F.2d 894 (7th Cir.1990) (per curiam), so like other jurisdictional rules this is a technicality with teeth. The term of the Special October 1984 Grand Jury that indicted the defendants expired on April 1, 1986, and the defendants were not indicted till August, so it is critical whether the life of the grand jury was extended. No order extending it exists but in *United States v. Taylor*, 841 F.2d 1300, 1306 (7th Cir.1988),

a case involving the same grand jury, we held that it was enough that Chief Judge McGarr, who had presided over the Special October 1984 Grand Jury, had made a determination to extend it for another six months. As evidence that he had made such a determination we cited a *"nunc pro tunc"* order that he had issued on March 3, 1987, after the grand jury's term had (even if extended) expired. When, shortly after *Taylor* came down, the defendants asked us for a writ of mandamus directing Judge Holderman to dismiss the indictment because the grand jury's term had expired, we denied the writ, stating that *Taylor* "controls this case." *In re Daniels*, No. 88–1750 (7th Cir. April 25, 1988) (unpublished).

The government argues that *In re Daniels* establishes the law of this case, thus providing another reason besides *stare decisis* why we should not reexamine *Taylor*. But we are not disposed to reexamine the holding of *Taylor* in any event, the holding being only that a formal order is not necessary to extend the life of a grand jury. Although the defendants in this case disagree with that holding, the main thrust of their argument is different. It is that the *nunc pro tunc* order is not reliable evidence of Judge McGarr's determination to extend the grand jury.

█ When the order was issued, not only had the grand jury's term, even if it had been extended by six months, expired, but Judge McGarr was *no longer chief judge* and hence was no longer presiding over grand juries. On both accounts he had no authority to extend the life of the grand jury. A judge may correct a clerical error at any time, pursuant to Rule 36 of the criminal rules, a parallel provision to the better known rule 60(a) of the civil rules. But he may not rewrite history. *United States v. Janik*, 723 F.2d 537, 545 (7th Cir.1983); *King v. Ionization International, Inc.*, 825 F.2d 1180, 1188 (7th Cir.1987). The significance of Judge McGarr's *nunc pro tunc* "order" (not really an order) is evidentiary, as is apparent from its wording, which speaks of Judge McGarr's recollections and intentions during the grand

jury's initial eighteen-month term. In *Taylor* we were given no reason to doubt the reliability of these recollections and intentions and treated the "order" as, in effect, an unrebutted affidavit. The present defendants have submitted evidence, which Judge Holderman may have brushed aside too quickly, that the order is not reliable. The order was drafted by government lawyers and given to Judge McGarr to sign without notice to the defendants or to their lawyers. It is signed but of course not attested.

█ Imagine that Judge McGarr had retired before March 1987 and it became necessary to determine whether he had extended the term of the grand jury during its initial eighteen-month term. The government could not have gone to Judge McGarr and asked him for an order; a retired judge (as distinct from a judge who, having reached retirement age, remains in service as a senior judge) has no authority to issue orders. The government would have had to ask Judge McGarr for an affidavit and the defendants would have been entitled to contest the affidavit by suitable means which might have included questioning both the grand jurors and Judge McGarr under oath. What difference should it make that Judge McGarr had not yet retired (he has retired since, and returned to the practice of law) when the government lawyers came to see him? He was no longer presiding over grand juries and had no authority to issue orders concerning them; in any event the Special October 1984 Grand Jury had disbanded and its members had dispersed.

█ The issue of the adequacy of Judge McGarr's order *as evidence* was not clearly presented in *Taylor*. The defendants' subsequent petition for mandamus raised it clearly enough but the issue was not a suitable one for mandamus and our remark in denying the petition that *Taylor* "controls this case" was dictum. In both of those proceedings we assumed rather than determined the reliability of the *nunc pro tunc* order as evidence of Judge McGarr's recollections and intentions. What is more, in disposing of still another

futile effort by the defendants to obtain a premature determination of the issue, the same panel that had denied the petition for mandamus later reassured the defendants that their challenge to the indictment would be considered on the merits when properly raised. *United States v. Daniels*, 848 F.2d 758, 760 (7th Cir.1988). There was no suggestion that the law of the case doctrine would prevent such consideration.

We did say in *Taylor* that we were examining Judge McGarr's order to determine whether "it contains evidence" that the judge had made the requisite determination to extend the grand jury's life, and that "this evidence [the order, plus the fact that the grand jury had voted to extend itself] suffices to show that the [Special October] 1984 Grand Jury was properly extended for six months." 841 F.2d at 1308–09. But the word "evidence" was not used with its technical legal meaning. The ex parte character of the order and the fact that Judge McGarr was no longer chief judge when he signed it should have been evident but they were not discussed and their significance was not grasped. The order's adequacy as evidence was, in short, not confronted. Judicial assumptions concerning, judicial allusions to, and judicial discussions of issues that are not contested are not holdings. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 119, 104 S.Ct. 900, 918, 79 L.Ed.2d 67 (1984); *Hagans v. Lavine*, 415 U.S. 528, 533 n. 5, 94 S.Ct. 1372, 1377 n. 5, 39 L.Ed.2d 577 (1974); *Zenith Radio Corp. v. United States*, 437 U.S. 443, 459–62, 98 S.Ct. 2441, 2449–51, 57 L.Ed.2d 337 (1978); *United States v. House*, 808 F.2d 508, 511 (7th Cir.1986); *Glidden v. Chromalloy American Corp.*, 808 F.2d 621, 625 (7th Cir.1986); *Zbaraz v. Hartigan*, 763 F.2d 1532, 1544–45 (7th Cir.1985). The holding of *Taylor* is simply that the absence of an order entered before the initial term of the grand jury had expired was not a fatal defect invalidating the indictment. That holding would not be impaired by a conclusion based on the different record and arguments in the present case that the evidentiary foundations for the finding that the grand jury

was in fact extended are too wobbly to permit the matter to rest.

■ *Taylor* refers repeatedly to Judge McGarr's "determination," made during the life of the grand jury though memorialized afterward, to extend that life. Another name for "determination" is, it might seem, "order," making the failure to memorialize it in a writing the kind of clerical oversight that can be corrected (without notice) under Rule 60(a) of the civil rules or, as here, Rule 36 of the criminal rules. Such a correction can be made, in the words of Rule 36, "by the court at any time." Judge McGarr was a judge of the district court when he made the correction, and the proper member of a court to correct an oversight is the judge who committed the oversight in the first place. Since Rule 36 empowers the judge to act on his own initiative, the fact that the oversight was drawn to his attention by an ex parte submission of one of the parties would not invalidate the corrective order.

■ Unfortunately there is no way in which Judge McGarr's "determination" to extend the life of the grand jury can be deemed an "order." Not only does *Taylor* deny the possibility of such a characterization, 841 F.2d at 1306, but an order is a public act, not an internal mental act. A judge does not make an order, formal or informal, written or oral, when he decides, without telling anybody, that he has determined that the grand jury has unfinished business. The failure to announce his determination may be an oversight but it is not an oversight in an order, judgment, or any other part of the record, and it therefore cannot be corrected under Rule 36.

■ It is a question of fact whether Judge McGarr was mistaken in his recollection of having made an uncommunicated determination that the life of the grand jury should be extended. For obvious reasons, disputes over judicial recollection are not customarily resolved by placing the judge on the witness stand. The issue has arisen in cases where a judge is asked to vacate a criminal defendant's sentence on the ground that the presentence report contains false information, and he denies the

motion on the ground that he did not rely on the information in deciding what sentence to give. We have upheld these denials even though the judge was not subjected to the fires of cross-examination. *Johnson v. United States*, 805 F.2d 1284, 1289 (7th Cir.1986); *Blake v. United States*, 841 F.2d 203, 207 n. 3 (7th Cir.1988); *United States v. Montoya*, 891 F.2d 1273, 1280 (7th Cir.1989); see also *United States v. Baron*, 860 F.2d 911, 919–20 (9th Cir.1988); but see *United States v. Fernandez–Angulo*, 897 F.2d 1514 (9th Cir.1990) (en banc). We assume that our judges are not only honest but also not unduly suggestible, and therefore that Judge McGarr would not have signed an order stating that he recalled extending the grand jury unless he accurately recalled having done so. (Chief Judge Grady, who succeeded Judge McGarr as chief judge, recalled *not* having extended a grand jury that handed down an indictment after the expiration of its eighteen-month term, and the result was the dismissal of the indictment. *United States v. Clemenic*, 886 F.2d 332 (7th Cir.1989), published as an appendix to *United States v. Bolton, supra*, 893 F.2d at 896–901.) It was not a recollection about the remote past, compare *Krist v. Eli Lilly & Co.*, 897 F.2d 293 (7th Cir.1990), and it was consistent with the fact that the grand jury had voted to extend its term. There can be no serious doubt about what Chief Judge McGarr would have done had he been asked in timely fashion to issue an order extending the life of the grand jury. The "evidentiary hearing" conducted in this case to determine Judge McGarr's recollection was unsatisfactory, for the reasons we have indicated, but we do not think it was so defective that we should remand for a further hearing at which Judge McGarr would be placed under oath, examined, and cross-examined—with results entirely predictable.

Although we conclude that the indictment in this case was valid, we are greatly distressed at the amount of judicial time that has been consumed by this snafu, the result of the failure of the United States Attorney for the Northern District of Illi-

nois to keep track of his grand juries. We trust that steps will be taken to prevent a recurrence of such negligence.

▇▇ Several issues raised by Daniels alone also merit discussion. First, he argues that he was coerced into pleading guilty by promises that he would get a lighter sentence and also that he would be let out of solitary confinement at the Metropolitan Correctional Center, where he was being held to prevent him from continuing to conduct his drug ring from jail. There is no evidence of the latter promise beyond the fact that, shortly after Daniels pleaded guilty, he was indeed let out of solitary confinement. This could have been a coincidence, and it did not require Judge Holderman to find, in the absence of any other evidence, that the plea had been coerced.

Regarding the promise of leniency in sentencing, Daniels stresses Judge Holderman's statements during the guilty-plea hearing that "I give substantial weight ... if a defendant who is guilty is willing to admit that to himself and to other people around him and to me" and "substantial consideration to people who believe they are guilty [when they] admit it," and his interrupting the hearing to sentence a defendant in an unrelated case who had pleaded guilty. The judge told everyone in the courtroom (thus including Daniels) to pay close attention to that sentencing, then told the defendant in the unrelated case that he always takes a guilty plea into account in sentencing and proceeded to sentence him to probation. Daniels argues that by staging this little show of compensated contrition Judge Holderman led him to expect that if he pleaded guilty he would get off with a sentence a lot shorter than 55 years. The government replies that had Daniels not pleaded guilty, Judge Holderman might well have sentenced him to life in prison without parole. The government points out that, with time off for good behavior, Daniels can expect to be released in the year 2024, when he will be "only" 73 years old. In fact his life will have been ruined.

▇▇ A plea bargain is a contract. If the government, or the judge, breaks the contract, the defendant must be allowed to withdraw his plea. *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971); *United States v. O'Brien,* 853 F.2d 522, 525–26 (7th Cir. 1988); *United States v. Strawser,* 739 F.2d 1226, 1229 (7th Cir.1984); *Brooks v. United States,* 708 F.2d 1280 (7th Cir.1983). And no more than in ordinary contract law need a promise in a plea negotiation be express in order to bind. *United States v. O'Brien, supra,* 853 F.2d at 526; *United States v. Bowler,* 585 F.2d 851, 854 (7th Cir.1978). But the content of the promise is a question of fact, *United States v. Strawser, supra,* 739 F.2d at 1229; *United States v. Fields,* 766 F.2d 1161, 1168 (7th Cir.1985), and we cannot say that Judge Holderman made a clear error in determining that he had not broken any promise of leniency. Daniels could not expect Judge Holderman to give him probation if he pleaded guilty. The only promise reasonably to be inferred from the judge's statements and conduct was that Daniels would receive an undefined amount of consideration if he pleaded guilty—enough consideration to avoid a sentence of imprisonment for his natural life, for that was the maximum sentence, but beyond that he was throwing himself on the judge's mercy. If he stood trial, as was his right, almost certainly he would not only be convicted but also be sentenced to life imprisonment without possibility of parole, and it must have seemed preferable to him to gamble on Judge Holderman's generosity. That he was disappointed does not establish a breach of contract.

▇▇ We are troubled that Judge Holderman should be the official deputed to determine whether Judge Holderman broke his promise to the defendant. It seems to make him a judge in his own cause. But that is not the view that our legal system takes of such cases. A defendant who wants to withdraw his guilty plea before sentencing must address his motion in the first instance to the judge who accepted the plea (unless the judge has died or retired or recused himself), for that is

the judge in the case. After sentencing, if you want to withdraw your guilty plea you must return to the sentencing court, 28 U.S.C. § 2255, and as a practical matter that means the sentencing judge. These are just two illustrations, although highly pertinent ones, of the point that our legal system often empowers a judge to decide, subject only to deferential appellate review, whether a previous ruling by him was in error. The procedure is not a denial of due process. Even though most judges, like most anyone, are reluctant (if only unconsciously) to acknowledge their mistakes, judges are not interested parties in the sense of having a monetary interest in the outcome of their rulings or a familial or other close relationship with a party or a lawyer in the case. We do not allow trial judges to sit on appeals from their cases but we do allow them to reconsider their rulings. 28 U.S.C. § 47; *Russell v. Lane*, 890 F.2d 947 (7th Cir.1989); *David v. Attorney General*, 699 F.2d 411, 416–17 (7th Cir.1983). A plea to withdraw a guilty plea is considered in this light. The fact that the specific determination Judge Holderman had to make was whether he had broken his promise is immaterial, for the situation would be the same if he were asked to reconsider an order denying a motion for an extension of time on the ground that he had promised the extension.

▮ Even if there was no breach of an implied promise to Daniels he still can argue that since a promise of leniency can result in a *confession's* being adjudged coerced, *United States v. Rutledge*, 900 F.2d 1127, 1129–30 (7th Cir.1990); *United States v. Guerrero*, 847 F.2d 1363, 1365 (9th Cir.1988); *Quartararo v. Mantello*, 715 F.Supp. 449, 460–61 (E.D.N.Y.), aff'd without opinion, 888 F.2d 126 (2d Cir.1989), the same should be true with respect to a guilty plea, which is like a confession but even more conclusive. However, the analogy between a confession and a guilty plea—expressly rejected in *Brady v. United States*, 397 U.S. 742, 754, 90 S.Ct. 1463, 1472, 25 L.Ed.2d 747 (1970)—is not perfect. If it were, there could be no plea bargaining, an essential element of which is the

prosecutor's implied promise of leniency if the defendant forgoes his right to put the government to the expense and uncertainty of a trial. The elaborate hearing that is required before a judge can accept a guilty plea is designed to assure that the defendant is not induced by the promise of leniency to plead guilty to a crime he did not commit. But that the promise is the inducement is taken for granted; and although this is distressing to the opponents of plea bargaining, their views have yet to move the Supreme Court or Congress. Perhaps if the promise of leniency were so extravagant that it would induce even an innocent person to plead guilty, the plea would be invalid, although *Brady* can be read to suggest not. 397 U.S. at 758, 90 S.Ct. at 1474. Suppose, fantastically, that a person accused of first-degree murder, but innocent, were offered a plea of guilty to a traffic offense. The risk of conviction of murder, even if slight, would when multiplied by the cost to the defendant of being punished if he were convicted induce many a rational but innocent defendant to plead guilty to the traffic offense; a plea in these circumstances, although entirely voluntary, would be unreliable. Even then it could be argued that the defendant would be protected by the trial judge's obligation to inquire whether the plea has a factual basis, and that any limitation on freedom of contract deserves defendants' interests. We need not pursue the issue further; however the considerations we have listed may balance out, we were speaking in our hypothetical case of an *extravagant* promise, and there was no such promise in our actual case unless Judge Holderman was implicitly promising Daniels probation if he pleaded guilty. Not even Daniels argues that.

The last question we discuss is whether Judge Holderman should have granted the defendants' motion to suppress evidence obtained by the FBI's recording of Daniels' telephone calls from jail on the ground that it violated the federal wiretapping law. 18 U.S.C. §§ 2510 *et seq.* As in *United States v. Feekes*, 879 F.2d 1562, 1565–66 (7th Cir. 1989), we need not decide whether this is a

case of consent by one of the parties to the phone conversation (namely Daniels) and is therefore within the exception in 18 U.S.C. § 2511(2)(c). The government does not advance its cause with us by arguing that Daniels' consent can be inferred from a provision in the Code of Federal Regulations which says that inmates' phone calls may be monitored. That is the kind of argument that makes lawyers figures of fun to the lay community, and although a respected sister court has accepted it, *United States v. Amen*, 831 F.2d 373, 379 (2d Cir.1987), we place no weight on it. In addition, however, Daniels not only signed a form which states "I understand that telephone calls I make from institution telephones may be monitored and recorded," but also stated in one of the monitored and recorded conversations: "don't think for one minute this conversation ain't being recorded." He thought that by the use of a simple code he could prevent the eavesdroppers from understanding what he was doing. He thought wrong. This may make his case seem identical to that of a person who consents to the search of his house, erroneously believing that the police will fail to do a thorough job and uncover the contraband that he has concealed in it. No law shields evidence thus obtained from use in a criminal prosecution. But knowledge and consent are not synonyms. Taking a risk is not the same thing as consenting to the consequences if the risk materializes. A person who walks by himself late at night in a dangerous neighborhood takes a risk of being robbed; he does not consent to being robbed. We would be surprised at an argument that if illegal wiretapping were widespread anyone who used a phone would have consented to its being tapped and would therefore be debarred from complaining of the illegality.

█ However, here as in *Feekes* the government has a good alternative ground for the admissibility of the wiretap evidence. Section 2510(5)(a)(ii) of the Criminal Code allows wiretapping "by an investigative or law enforcement officer in the ordinary course of his duties." This describes what the FBI agents were doing when listening to Daniels conduct an illegal enter-prise. See also *United States v. Sababu*, 891 F.2d 1308, 1328–29 (7th Cir.1989); *United States v. Paul*, 614 F.2d 115, 117 (6th Cir.1980).

AFFIRMED.