UNITED STATES of America,

v.

Troy **FOOTMAN**, Defendant.

No. CR. 98–CR–10067–NG.

United States District Court, D. Massachusetts.

Nov. 12, 1998.

Paula J. DeGiacomo, U.S. Attorney's Office, Boston, MA, for U.S.

Jonathan Shapiro, Stern, Shapiro, Weissberg & Garin, Boston, MA, for Troy Footman.

Charles P. McGinty, Federal Defender Office, Boston, MA, for Kimyou Tes.

### MEMORANDUM AND ORDER

GERTNER, District Judge.

## I. INTRODUCTION

The indictment in this case charges defendants Troy Footman ("Footman") and Kimyou Tes ("Tes") with conspiracy to violate and violations of 1) 18 U.S.C. § 2423(a) (interstate transportation of minors for purposes of prostitution); 2) 18 U.S.C. § 2421 (interstate transportation of an adult individual for the purposes of prostitution); and, 3) 18 U.S.C. § 1952(a)(1) and (2) (use of an interstate facility with the intent to distribute the proceeds of any unlawful activity, or to further any unlawful activity, including prostitution).

The indictment charges that from on or about June 1996 to on or about April 1997, defendants operated a prostitution ring at, among other places, the Delaware truck plaza, Dupont Highway, New Castle, Delaware ("the truck plaza"). As part of this ring, the Government alleges that the defendants transported and caused the transportation of individuals, including minor females, in the Lowell, Massachusetts, area to the New Castle, Delaware, area. While in Delaware the prostitutes entered the truck plaza and offered to engage in sexual activity with the truck drivers in exchange for a fee.

Further, the Government claims that it will introduce evidence of acts committed in furtherance of the conspiracy, including, in some instances, the use of physical force, threats and coercion. Finally, the Government plans to introduce evidence that on twelve occasions the prostitutes wired, via Western Union, $8,448.00—money earned from their prostitution activities—from the Pathmark Plaza, New Castle, Delaware, to Footman (and on one occasion Tes), in Massachusetts.

## II. GOVERNMENT'S MOTION TO INTRODUCE RAPE CONVICTION

The Government seeks to introduce the prior rape conviction of Footman to impeach him should he testify at trial. The rape conviction stems from Footman's guilty plea on February 12, 1986, to a charge of aggravated rape. Footman was sentenced to four to six years, fourteen months to serve, with the balance suspended, and probation for three years. On September 15, 1988, Footman's probation was revoked and he was committed for an additional four to six years. He was released from confinement on April 14, 1993.

The starting point for analysis is rule 609(a), Fed.R.Evid., which provides: "for the purpose of attacking the credibility of a witness," evidence that the defendant has been

convicted of a felony "shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused."[1]   Fed.R.Evid. 609(a)(1).

For probative value, the Government states repeatedly that Footman's credibility is essential in this case.  Were he to take the stand, the Government insists, he would claim that he is nonviolent, that he was simply trying to help the prostitutes, and that he did not commit acts of violence against them.

But the Government's statement of the reasons for admitting this conviction underscores the real dilemma.  The conviction at issue, rape, is similar to the allegations in the instant case.  To be sure, it was a state crime, lacking the elements required for federal jurisdiction.  Nevertheless, the core of the conviction, and much of the Government's evidence in this case—coercing women to have sex or perform sexual acts with others—is comparable.

The Government insists that the jury can easily make a distinction between the lawful purpose of the evidence—to attack Footman's credibility, and the unlawful purpose— "he did it before and therefore he will do it again."  Anecdotal evidence and precedent, not to mention social science studies, make it quite clear that the jury cannot perform the mental acrobatics the Government would require of them, and further, that a limiting instruction would be useless.

Even in the ordinary case, admissibility of prior convictions creates an "halo effect" which causes the jury to see the defendant as "bad," regardless of the other evidence in the case.  A similar conviction exacerbates the impact.  "Attribution theory" suggests that the "halo effect" of prior convictions is at its height in the jury setting.  Robert D. Okun, *Character and Credibility: A Proposal to Realign Federal Rules of Evidence 608 and 609*, 37 Vill. L.Rev. 533, 551 (1992).  A group of people who do not know the defendant but must decide whether he or she is engaged in criminal activity, will infer negative characteristics about him when they receive negative information that he previously engaged in criminal activity.  According to the theory, the juror that hears about a defendant's prior convictions or bad acts will not consider that evidence solely in terms of the defendant's credibility, but also will form unfavorable impressions about the defendant's overall personality.  They are then willing to believe that he is more likely to have committed the alleged crime, regardless of the evidence.

In one study, forty-eight mock jurors were given a fact pattern for a breaking and entering case.  *See* Anthony N. Doob and Hershi & Kirshenbaum, *Some Empirical Evidence on the Effect of S.12 of the Canada Evidence Act Upon an Accused*, 15 Crim. L.Q. 88 (1972–1973).  The jurors were divided into the following four groups: 1) jurors who neither learned about the defendant's prior convictions, nor received information about whether the defendant took the stand; 2) jurors who learned that the defendant did not testify but did not learn about the prior convictions; 3) jurors who learned that the defendant testified and had seven convictions for similar crimes;  and, 4) jurors who learned that the defendant testified and had seven prior convictions and were given a limiting instruction that the conviction should be considered only in evaluating the defendant's credibility.  *Id.* at 92–93.  The jurors who learned of the prior convictions gave a higher guilt rating to the defendant than did the jurors who did not learn of the prior convictions.  *Id.* at 93. · (Ironically, the jurors who were given a limiting instruction gave the very highest guilt rating to the defendant.  *Id.*)

In Valerie P. Hans and Anthony N. Doob, *Section 12 of the Canada Evidence Act and the Deliberations of Simulated Juries*, 18 Crim. L.Q. 235 (1975–1976), two different sets of mock jurors were involved: four individual mock jurors and thirty, four-person groups of mock jurors.  Both groups read a fact pattern of a burglary case.  *Id.* at 239.  One group learned that the defendant had a prior burglary conviction and was given a limiting instruction; the other group was not

---

1.  Footman's commitment as a result of his February 12, 1986, guilty plea ended on April 14, 1993.  Under 609(b), the release date is the relevant date for determining the remoteness of the conviction.  *See* Fed.R.Evid. 609(b)

informed that the defendant had a prior conviction. *Id.* Although both sets of jurors who learned of the prior conviction were more likely to convict the defendant, this was particularly true in the group setting. *Id.* at 243.[2]

Apart from the obvious prejudicial effect of this conviction on the jurors, the Government is disingenuous in suggesting that its need for the evidence is extraordinary.[3] While the case, as characterized by the defense, will be a credibility contest, the Government intends to offer considerably more. I am told that at least two prostitutes will testify against the defendant; records will be introduced concerning the defendant's efforts to rent rooms for the prostitutes in the Delaware truck stop area; his name is on several wire transfers. *See e.g. United States v. Sanders,* 964 F.2d 295, 297 (4th Cir.1992) (although evidence of prior convictions may be thought generally probative of Sanders' lack of credibility, they were extremely prejudicial since they involved the exact type of conduct for which Sanders was on trial). *See also, United States v. Bagley,* 772 F.2d 482, 488 (9th Cir. 1985), *cert. denied,* 475 U.S. 1023, 106 S.Ct. 1215, 89 L.Ed.2d 326 (1986).

The Government's motion to introduce the prior conviction is therefore **DENIED.**

### III. *DEFENDANT'S MOTION TO SUPPRESS TAPES OF OVERHEARD CONVERSATIONS AT THE MASSACHUSETTS DEPARTMENT OF CORRECTION AT CONCORD ("MCI CONCORD")*

Footman seeks to suppress certain tapes of overheard conversations at MCI Concord on the grounds that such recordings do not meet the standards of the Federal Wiretap Act ("Title III"). 18 U.S.C. § 2510, *et seq.* The Government claims that the prohibitions do not apply in this case for two reasons: First where, as here, either participant to a conversation consents to its recording, Title III's requirements do not apply, *see* 18

U.S.C. § 2511(2)(c); *Gilday v. Dubois,* 124 F.3d 277, 296–97 (1st Cir.1997) (consent may be express or implied); and second, apart from the issue of consent, the regular monitoring of inmates meets the "law enforcement" exception. *See* 18 U.S.C. § 2510(5)(a)(ii) (law enforcement exception applies when the conversations are intercepted "by an investigative or law enforcement officer in the ordinary course of his duties").

The Government first claims that the recipients of the calls provided prior consent. It supports this by noting that at the beginning of each call, and before any could be accepted, the recipients heard the following message:

> Nynex has a collect call from Troy Footman, an inmate at the Massachusetts Department of Correction at Concord. To refuse this call, hang up. If you use three-way calling or call waiting you will be disconnected. All call detail and conversation, excluding approved attorney calls, will be recorded. To accept this call, dial '1' now.

■ The Government also claims that Footman himself consented to the recording of his conversations when he signed two correctional forms in which he agreed that "acceptance of a p.i.n. and use of inmate telephones shall be deemed as consent to the conditions and restrictions placed upon inmate telephone calls including call monitoring, recording, and call detail." (*See* Massachusetts Department of Correction Inmate Telephone System Number Request Forms).

In further support of Footman's consent, the Government presented the fact that a large sticker attached to the phone informed Footman that his calls were being recorded. Finally, Footman's own words during the course of the transcripts make it clear that he knew that the calls were being recorded, but nevertheless, he chose to use the telephones.

---

**2.** Doob and Kirshenbaum ascribe their results to the "halo effect," described above. *Supra* at 90. *See also* Hans and Doob *supra* at 238–52.

**3.** In addition, even if it were only a credibility contest, and thus a far weaker case, I do not see

how that fact affects the balance between probative value and prejudice. The evidence would then be both extraordinarily prejudicial and very crucial to the Government.

The Government relies on *Gilday v. Dubois*, 124 F.3d 277 (1st Cir.1997) for the proposition that the Title III exemption for "consent" is "construed broadly as encompassing implied consent." *Id.* at 296. Specifically, the Government suggests that the corrections forms that Footman signed establish implied consent, as does the sticker on the phone.

I believe that this interpretation of *Gilday* goes too far. *Gilday* arose in the context of a civil contempt proceeding to determine whether or not new Massachusetts correctional regulations implementing the forms described above met Title III standards. The *Gilday* injunction, the violation of which was the subject of the case, provided:

> All officers, agents, servants, employees and attorneys of the Department of Correction are enjoined permanently, under both 18 U.S.C. § 2510 et seq. [Title III] and M.G.L. c. 272, § 99 et. seq., from intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept, and wire communication by or to plaintiff William Gilday without a specific court order or legislative authorization to do so, except as specifically permitted by these statutes, taken together, as they have been amended or may be amended and as they have been construed or may be construed in reported decisions that are binding in this Court or in the state courts of Massachusetts.

*Id.* at 280.

Thus, if the correctional regulations governing the use of the phones did not meet Title III standards, then the Department of Corrections violated Gilday's injunction. If the regulations met those standards, then the Department did not violate the injunction.

In *Gilday*, there was no briefing of the issues raised here, whether an incarcerated individual, held pending trial, with the need to communicate with his counsel and potential witnesses, can meaningfully consent to being overheard when the failure to consent means absolutely no access to the phone. Furthermore, in *United States v. Daniels*, 902 F.2d 1238, 1244–45 (7th Cir.1990), the Seventh Circuit raised valid concerns about

implying consent merely because a prisoner has notice of phone call monitoring. Acquiescence, the Court noted, does not mean implied consent. *Id.*; *see also United States v. Cheely*, 814 F.Supp. 1430, 1443 (D.Alaska 1992) (citing *Daniels*, 902 F.2d at 1244–45).

Nor am I willing to extend the law enforcement exception to allow law enforcement officers, and not simply correctional officers, to regularly probe inmate conversations.

■ However, I do agree that in this situation the individuals who affirmatively accepted these collect calls in the face of the Nynex warning, in fact consented to their recording. Whatever the constraints confronting the inmate, the recipient of these calls—a free citizen—faced none of them. As the Court in *Cheely* noted: "... a person aware of surveillance was arguably being benefitted by it and could avoid it by going somewhere else, while a prisoner either uses institutional phones or is cut off from the outside world." 814 F.Supp. at 1443. Therefore, the recipient's consent was adequate to waive Title III requirements. *See Willoughby*, 860 F.2d at 19 (finding that as one party had consented, the court does not have to address question of whether the other party had also consented); *see also United States v. Gomez*, 900 F.2d 43, 44 (5th Cir.1990)(stating that a tape of telephone conversation would be admissible only if either of the parties consented).

The defendant's motion to suppress these taped conversations is therefore **DENIED**.

## IV. *THE DEFENDANT ALSO SEEKS TO SUPPRESS THE FRUITS OF A SEARCH OF HIS HOME ON NOVEMBER 10, 1997*

■ The motion to suppress the fruits of a November 10, 1997, search of defendant's home was brought, literally, on the first day of Footman's trial. Defense counsel's only explanation for the delay is that he did not know until he received the Government's exhibit list that certain items would be introduced into evidence, items which had been obtained as a result of a search of his premises. Moreover, he contends that so much material was taken from Footman's premises

that counsel did not have an opportunity to review it prior to trial.

Counsel's explanations are unacceptable. Rule 12(f) Fed.R.Crim.P. provides that "failure by a party to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the court... shall constitute waiver thereof, but the court *for cause shown* may grant relief from waiver." (italics supplied). In this case, the search was conducted over eleven months ago, and had been litigated in the state court system. It was likely that the fruits of the search would be introduced into evidence. Since counsel concluded early on that there was probable cause to support the search, it was certainly available to him to examine whether or not the fruits of the search exceeded the scope of the warrant. Indeed, Rule 12(d)(2) provides a vehicle for the defendant to require the Government to give notice of the evidence it intends to introduce precisely so that the defendants can make decisions about whether to file a motion to suppress. *See* Fed.R.Crim.P. 12(d)(2). Defendant made no such motion. Finally, the issue, whether the actual search exceeded the probable cause described, requires an evidentiary hearing which is difficult, if not impossible to do at the eleventh hour, in the middle of a case, particularly when there is no valid reason therefor.

Therefore, the defendant's motion to suppress the evidence seized as a result of the search of the residence is also **DENIED**.

## V. *CONVICTIONS FOR PROSTITUTION*

The Government has sought to introduce evidence that certain of the women whom they may claim to have been part of Footman's prostitution ring were arrested and convicted of prostitution-related offenses in the state of Delaware. It seeks to introduce this in order to show that prostitution activity took place. The reasoning is: Because these women were convicted of prostitution in Delaware, therefore, the jury can conclude that they engaged in prostitution activity. The Government has not been able to offer any case justifying this extraordinary position, that evidence of a conviction can come in for the purpose of showing the underlying conduct.

Rather, the law is clear: The Constitution obliges that Footman be given an opportunity to challenge the underlying conduct: Was there prostitution activity in Delaware? By whom and under what circumstances? Accordingly, the convictions are **EXCLUDED**.[4]

**SO ORDERED.**

### *ORDER*

The Government and the Defendant, Troy Footman, have moved this court to consider various evidentiary issues. For the reasons set forth in the accompanying Memorandum and Order, the Government's Motion to Admit Defendant's Prior Convictions for Impeachment [docket # 89] is **DENIED**; Defendant's Motion to Suppress Evidence of Defendant's Prison Telephone Conversations [docket # 116] is **DENIED**; Defendant's Motion to Suppress Evidence Seized from the Defendant's Residence [docket # 117] is **DENIED**; and the evidence offered by the Government to prove convictions for prostitution [offered in open court] is **EXCLUDED** for the purpose of showing that prostitution activities took place.

**SO ORDERED.**

---

**4.** I indicated that the Government could introduce evidence of statements made by the alleged prostitutes admitting to prostitution activities as coconspirator hearsay under Rule 801(d)(2)(E), Fed.R.Evid. Defense counsel has indicated that typically comments made after an arrest and conviction do not fit within the coconspirator exception to the hearsay rule, and I agree. Nevertheless, the Government has credibly argued that in the case of this prostitution ring, the usual rule does not apply. It was part of the conspiracy to immediately plead guilty to the prostitution offense (in what was essentially night court), pay the fine, and get back on the street. Accordingly, and on a *de bene* basis, these statements can be ADMITTED.