**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 08-4163**

---

UNITED STATES OF AMERICA,

                    Plaintiff - Appellee,

          v.

JAMES ANTHONY FRINK,

                    Defendant - Appellant.

---

**No. 08-4233**

---

UNITED STATES OF AMERICA,

                    Plaintiff - Appellee,

          v.

GREGORY L. WALKER,

                    Defendant - Appellant.

---

Appeals from the United States District Court for the Eastern District of North Carolina, at Wilmington.   Earl W. Britt, Senior District Judge.  (7:07-cr-00076-BR-2; 7:07-cr-00076-BR-1)

---

Argued:  March 27, 2009              Decided:  May 14, 2009

---

Before WILKINSON, MOTZ, and GREGORY, Circuit Judges.

---

Affirmed by unpublished per curiam opinion.

_____

**ARGUED:** Stephen Clayton Gordon, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina; Paul K. Sun, Jr., ELLIS & WINTERS, LLP, Raleigh, North Carolina, for Appellants.  Anne Margaret Hayes, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Thomas P. McNamara, Federal Public Defender, Raleigh, North Carolina, for Appellants.  George E. B. Holding, United States Attorney, Jennifer May-Parker, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This is a consolidated appeal by James Anthony Frink and Gregory L. Walker challenging the nonproduction of purportedly exculpatory evidence, the admission of Walker's jailhouse telephone conversations with his girlfriend, the suggestiveness of the photographic array used to identify Walker, the sufficiency of the evidence to convict both Walker and Frink, Walker's career offender enhancement, and the propriety of charging Frink with a firearm offense. Finding no error, we affirm.

I.

The events giving rise to this case are as follows. In August 2006, Sergeant Steven Worthington of the Columbus County, North Carolina, Sheriff's Office began an investigation into drug trafficking in Whiteville, North Carolina, in an area known as Stanley Circle. Because the officers determined that the community would be difficult to penetrate even in unmarked cars, Worthington decided to utilize a confidential informant named Edward Boone. Boone had previously worked as a confidential informant for other police departments. The record indicates that Boone had no other source of income; lived in an apartment paid for by the Bladen County, North Carolina, authorities; and

3

used a cellular telephone and bicycle also paid for by Bladen County.

Boone did not have an inside connection with the Stanley Circle drug trade, so he arranged for an introduction through an acquaintance, Tremaine Howard. Howard did not know that Boone was operating as a police informant. On August 14, 2006, Boone and Worthington met at a staging area where Worthington gave him $1700 in order to buy drugs. The officers then took Boone back to his apartment complex, where he met Howard. Boone and Howard picked up another man named "Full Throttle" and proceeded to Stanley Circle. Worthington and other officers observed the men from the time they left the complex until they approached Stanley Circle. At that point, about half of a mile away, the officers pulled into a shopping center parking lot so that they would not be observed. From that location, however, the officers could not receive a signal from the audio recording device they had planted on Boone. At Stanley Circle, Full Throttle approached someone named "J.," and Boone joined them. J. sold Boone two ounces of crack cocaine for $1700, after which J. gave Boone his telephone number. At trial, Boone identified J. as defendant James Frink.

On August 16, Boone made a recorded phone call to J. to ask for more drugs and for a gun. He followed up during another recorded conversation on August 22, at which point J. quoted a

4

price of $1000 per ounce of crack cocaine and offered to sell it to him later that day. However, J. said that he did not yet have the gun. Worthington gave Boone $1000 to purchase the drugs. Boone arranged for a man named Donnell to drive him to Stanley Circle. Boone purported to get lost on the way, and he called J., who met him at a grocery store parking lot and then led the way back to Stanley Circle. Across the street from the store parking lot, Worthington saw J., whom he identified as Frink, drive up, but Worthington remained in the parking lot and did not follow them. When Boone and company arrived at Stanley Circle, a gray Buick was about to drive out, but it then backed up and parked once it saw them. Boone was allegedly only five feet away from the Buick, and at trial, he identified its driver as defendant Gregory Walker, whose alias was "C-Man." J. approached C-Man before returning to his own car, after which they both drove away. J. returned shortly thereafter, and from J.'s back seat, Boone exchanged his money for crack cocaine. He asked if J. could get him a gun, and J. responded that he could.

On August 23, 2006, Boone made two recorded telephone calls to J. asking if J. had a gun for him. J. said that he did, and Boone also requested more drugs. The next day, Boone placed another recorded telephone call to J., and J. said that the gun would be "a little thirty-two" and would cost about $150. (Supp. J.A. 713.) Worthington gave Boone $1050, and Howard

5

drove Boone to Stanley Circle. Worthington assumed his usual post in the parking lot and, once again, could not record what transpired. When Boone pulled into Stanley Circle, a green Ford Expedition was parked there. C-Man was in the driver's seat, and he handed a bag to J. J. then got into Boone's back seat and gave him the bag, which contained crack cocaine. J. also gave Boone a gun. Boone gave J. the $1050, but J. said that he owed another $100. They arranged for Boone to pay the remainder later. When Boone reported back, Worthington found the .32-caliber gun to be fully operational.

After the August 24 transactions, Worthington requested assistance from the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). Special Agent Geoff Brown was sent to lead the investigation. Brown assigned Special Agent Charles Patterson to accompany Boone on a future transaction at Stanley Circle. On October 25, Patterson and Boone met to discuss their cover story. Patterson would drive a Chevrolet Silverado pickup truck that was equipped with audio and video recording equipment. Brown gave Patterson cash to buy firearms and two ounces of crack cocaine. Boone and Patterson went to Stanley Circle on October 27, but neither J. nor C-Man was present. However, they talked to a man named "Dede," who called C-Man. When C-Man arrived, Dede talked to him, then C-Man left to go get the drugs. Brown, Worthington, and other officers were at

6

their usual location and observed a truck leave Stanley Circle and return shortly thereafter. When C-Man returned, he gave a plastic bag containing crack cocaine to Dede, who took it to Patterson and Boone. Boone identified defendant Walker as the person in the truck who handed Dede the drugs. Patterson also identified Walker, both in court and in a photographic array, as the person in the truck. Boone gave Dede $2100. Patterson asked Dede if he had any guns. After conferring with C-Man, Dede returned and relayed that J. would return an hour later with the guns. Patterson and Boone did not wait for him to return, and Walker and Frink were subsequently arrested.

While in custody at the Columbus County Jail, Walker made a series of telephone calls to his girlfriend, Alice Faye Black. During these phone calls, several drug references were made, including questions about how his clientele would continue to be serviced. Walker challenges the admission of the telephone calls at trial.

The appellants were charged with conspiring to distribute, and possessing with intent to distribute, more than fifty grams of cocaine base, and with distributing five or more grams of cocaine base. Additionally, Frink was charged with using and carrying a firearm during and in relation to a drug trafficking crime, and with possessing a firearm in furtherance of a drug trafficking crime. The jury found Frink guilty on all counts,

7

and it found Walker guilty on all counts except one of the drug distribution counts. The district court sentenced Frink to an imprisonment term of 187 months and Walker to a term of 360 months.

## II.

The appellants raise several issues, each of which will be addressed below.

### A.

Walker and Frink argue first that the government failed to disclose exculpatory information when it did not provide the entire set of recordings from the various drug transactions in which Boone interacted with the appellants. Instead, they allege that the government produced only a short, edited videotape of the final transaction that involved Agent Patterson. They contend that the undisclosed recordings have inherent exculpatory value and that their nondisclosure entitled them to a judgment of acquittal. Frink makes this argument for the first time on appeal, so we review his claim for plain error. United States v. Higgs, 353 F.3d 281, 309 (4th Cir. 2003). Walker raised the issue below, but the district court denied his motion. The denial of a motion for a judgment of acquittal is reviewed de novo. United States v. Romer, 148 F.3d 359, 364 (4th Cir. 1998).

In support of their argument, the appellants cite California v. Trombetta, 467 U.S. 479 (1984). There, the Supreme Court found that the Due Process Clause did not require California to preserve original breathalyzer samples. First, the Court noted that the government did not act in bad faith in failing to preserve the samples. Second, the Court set forth the following test of constitutional materiality: "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. at 489.

Contrary to appellants' contentions, while it is possible that the recordings of the drug transactions would have contained exculpatory information, such exculpatory value is far from being evident on its face. More important, however, is the fact that there is no concrete evidence that the recordings ever existed. Worthington consistently maintained that he was unable to record the transactions from his standpoint a half-mile away. (J.A. 200, 202-04.) Although reports drafted after each transaction indicate that the audio equipment "enabled agents to listen" to the transactions (J.A. 200-01, 203, 204-05.), the government concedes that the report is inaccurate. There is no evidence of the recordings outside of these reports, and Worthington consistently testified that they did not exist.

9

Moreover, the appellants' evidence of the existence of an audio recording of Agent Patterson's wire during the October 27 transaction separate from the truck's audio and video recording is similarly lacking.  The only evidence the appellants point to that shows the existence of a separate audio recording of the wire is that Patterson said that there were "two recordings." (J.A. 455.)  However, he then immediately followed that statement with a contrast of the wire that "everybody can hear" and the "audio and video recording from the truck itself."  (Id. (emphasis added).)  Later in his testimony, he once again distinguished between the wire that allowed agents to "hear" him and the "audio recordings that is [sic] recorded on the truck." (J.A. 481 (emphasis added).)  Read in context, Patterson's testimony suggests that the wire communications were not recorded.  Without concrete evidence of the existence of any of the recordings that the appellants desire, we cannot find that the government improperly withheld them.  Therefore, this contention fails.

### B.

The appellants next make several challenges concerning the recording of Walker's jailhouse telephone calls.  The district court's evidentiary rulings are reviewed for abuse of discretion and, pursuant to Federal Rule of Criminal Procedure 52, we will disturb the district court's decision only if an error was not

10

harmless.  United States v. Brooks, 111 F.3d 365, 371 (4th Cir. 1997).

Walker contends that Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 (2006), prevents the use of the recorded jailhouse telephone conversations between him and his girlfriend.[1]  Title III generally prohibits the unauthorized interception of "any wire, oral, or electronic communication."  Id. at § 2511(1)(a) (2006).  All of the parties agree that Title III applies to jailhouse telephone calls, and Court precedent supports this conclusion.  United States v.

[1] Frink also challenges the recordings, but we conclude that he does not have standing to do so.  Title III provides to any "aggrieved person" the ability to move for suppression of an intercepted communication.  18 U.S.C. § 2518(10)(a) (2006).  The statute defines an "aggrieved person" to be "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."  Id. at § 2510(11).  This Court has held that in order for a party to show that he was aggrieved, he must demonstrate that "he was a party to an intercepted communication, that the government's efforts were directed at him, or that the intercepted communications took place on his premises."  United States v. Apple, 915 F.2d 899, 905 (4th Cir. 1990).

In this case, Frink was not a party to the communications and the communications did not take place on his premises. While the government's efforts might have been broadly directed at him in the sense that they were trying to gather evidence for the conspiracy, there is no indication that Frink was specifically targeted in these recordings.  Indeed, since Walker never placed any phone calls to him from jail, it would be difficult to argue that the government's efforts were directed at him.  Therefore, Frink does not have standing to bring this claim.

11

Hammond, 286 F.3d 189, 192 (4th Cir. 2002). The parties differ, however, in their views on whether an exception to Title III applies that allows the use of the taped calls.

According to 18 U.S.C. § 2511(2)(c) (2006), "It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception." This Court construed the exception in Hammond, where it held: "We conclude that the 'consent' exception applies to prison inmates . . . required to permit monitoring as a condition of using prison telephones . . . ." 286 F.3d at 192.

The parties agree that at the beginning of each telephone call, before the recipient presses "0" to accept it, a recorded message is played that notifies the callers that their conversation is "subject to monitoring and recording." (E.g., Supp. J.A. 715, 721.) Given this warning, it would be difficult to find that Walker did not give his consent to the recordings. He argues, however, that "[t]he inclusion of a 'subject to monitoring' warning did not establish consent to the interception of the telephone calls; it merely established acquiescence to the prospect that the calls would be monitored." (Appellants' Br. 35.) In support of this proposition, he cites

12

United States v. Daniels, 902 F.2d 1238 (7th Cir. 1990). In that case, however, the Seventh Circuit merely noted that "knowledge and consent are not synonyms," but did not address the merits of the argument because it found the law enforcement exception to apply. Id. at 1245. Therefore, Daniels does not counsel against our finding the consent exception to apply.

With regard to the law enforcement exception, § 2510(5)(a)(ii) of Title III allows "an investigative or law enforcement officer in the ordinary course of his duties" to engage in an interception. In Hammond, this Court found the law enforcement exception to apply because "the [Bureau of Prisons] was acting pursuant to its well-known policies in the ordinary course of its duties in taping the calls." 286 F.3d at 192. The same reasoning would apply in this case.

Walker argues that the government did not make a showing that the calls were taped in the ordinary course of business at the jail or that they were intercepted by an investigative or law enforcement officer. However, as evidenced by the transcripts in the record and as Walker concedes (Appellants' Br. 37), all calls were routed through the jail's central recording system, and the message was played at the beginning of each outgoing phone call. Thus, law enforcement officers were acting in the ordinary course of their duties by taping the calls.

13

The appellants also assert that the telephone call recordings were inadmissible hearsay inasmuch as Black was not shown to be part of the conspiracy at issue. However, this Court has held, in a similar factual situation, that the statements of the recipient of a phone call made by a party "were reasonably required to place [the defendant's] responses into context. Accordingly, [the recipient's] statements were properly admitted to make [the defendant's] statements, so far as they constituted incriminating admissions, intelligible to the jury and recognizable as admissions." United States v. Wills, 346 F.3d 476, 490 (4th Cir. 2003) (internal quotations omitted). Thus, the appellants' hearsay objection fails.

The appellants maintain that the district court abused its discretion in admitting the transcripts of the recorded telephone calls because the government had made no showing of the intelligibility of the recordings and because they were cumulative. The appellants have identified no errors in the transcript, and it was within the district court's discretion to admit them. United States v. Capers, 61 F.3d 1100, 1107 (4th Cir. 1995). Moreover, the district court gave a limiting instruction in which it told the jury that, "if there is a doubt in your mind between what the transcript shows and what you hear on the tape, then you go by the tape because it is the

14

evidence." (J.A. 150.) Thus, it was not an abuse of discretion for the district court to admit the transcripts.

Finally, the appellants argue that the government failed to give adequate notice of anticipated expert testimony interpreting the recordings. Federal Rule of Criminal Procedure 16(a)(1)(G) requires the government to give, at the defendant's request, a summary that "describe[s] the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Specifically, the appellants take issue with Agent Smith's informing the jury that: 1) "papers" meant drugs or money (J.A. 517-18), 2) "four cans" meant four ounces of crack cocaine (J.A. 520), and 3) "J.A." meant "James Frink" (J.A. 522). However, it was the appellants themselves who asked Smith whether "four cans" meant "four ounces of drugs." (J.A. 525.) Additionally, the government simply asked Smith if he knew someone in the investigation whose initials were "J.A.," to which he responded, "James Anthony Frink." (J.A. 522.)

The most compelling claim the appellants present in this regard concerns the code words for the drugs. However, the decision to impose a sanction for violating Rule 16 is in the district court's discretion, see United States v. Hastings, 126 F.3d 310, 317 (4th Cir. 1997), and there is no indication that the defendants were prejudiced by the statements, see United States v. Chastain, 198 F.3d 1338, 1348 (11th Cir. 1999). This

15

is especially so in light of the fact that the government informed the appellants, prior to Agent Smith's testimony, that he would be testifying about drug-trafficking code words. Thus, we conclude that this argument also fails.

C.

The appellants next contend that Agent Patterson's out-of-court identification of Walker should not have been admitted because the procedure by which it was obtained was impermissibly suggestive and violated Walker's due process rights. In considering a similar situation in United States v. Saunders, 501 F.3d 384 (4th Cir. 2007), this Court determined that in order to prevail on such a due process claim, the following conditions must be met:

> First, the defendant must show that the photo identification procedure was impermissibly suggestive. Second, if the defendant meets this burden, a court considers whether the identification was nevertheless reliable in the context of all of the circumstances. A witness's out-of-court photo identification that is unreliable and therefore inadmissible on due process grounds also renders as inadmissible his subsequent in-court identification.

Id. at 389-90 (internal citation and footnote omitted). We review the matter de novo. Id. at 389.

In support of their contention that the photographic array was unnecessarily suggestive, the appellants cite to Department of Justice materials that recommend a sequential photograph lineup prepared by an officer who was not involved in the

16

investigation.[2]   The appellants contend that the photographic array presented to Patterson was unduly suggestive in that Walker's photograph was cropped differently, the photographs were not presented sequentially, and the array was prepared by Agent Brown, who knew what Walker looked like.

First, the handbook that the appellants refer to itself states in a disclaimer that its contents may not necessarily be the official position of the Department of Justice.   More importantly, while some methods of presenting photographs might be less suggestive than others, this Court is concerned with whether the identification was "'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'"   Id. at 389 (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)).   In the photographic array (J.A. 57), eight pictures of similar-looking men were presented. When Brown showed the array to Patterson, he indicated that Walker's photograph may or may not be in the array.

Upon reviewing the photographic array for the infirmities that the appellants note, Walker's photograph does not appear to this Court to be any more suggestive than the other photographs, especially since at least two other photographs also appear to

---

[2] U.S. Department of Justice, Eyewitness Evidence:  A Guide for Law Enforcement (1999), http://www.ncjrs.gov/pdffiles1/nij/178240.pdf.

be closely cropped. Although presenting an array of photographs sequentially might be ideal in terms of limiting misidentifications, we cannot say on the facts presented in this case that the manner of presentation was impermissibly suggestive.

Moreover, given Patterson's other interactions with Walker, the totality of the circumstances would support the reliability of his identification. In this regard, the appellants argue that there was no contemporaneous description by Patterson of Walker the day Patterson supposedly saw him in the pickup truck. Moreover, they contend that his visibility was limited by rain and note that he could not identify someone else in another vehicle that was as close as Walker's.[3] Finally, the appellants find it "implausible" that Patterson had not seen a photograph of Walker previously, given the centrality of Walker to the investigation. (Appellants' Br. 50.)

In Neil v. Biggers, 409 U.S. 188, 199-200 (1972), the Supreme Court identified five factors to consider in evaluating the reliability of eyewitness identification under the totality of the circumstances:

> [T]he opportunity of the witness to view the criminal
> at the time of the crime, the witness' degree of

---

[3] Patterson contends that the vehicle had tinted windows. (J.A. 481.)

18

attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

In the present case, Patterson testified that Walker was in his direct line of sight when he arrived at Stanley Circle and that he was able to see him clearly. Moreover, he was able to get several more looks at Walker over the course of the transaction. Second, there is no indication that Patterson was not paying attention, and as a trained police officer, his degree of attention is presumed to be higher than that of a lay person. See Manson v. Brathwaite, 432 U.S. 98, 115 (1977). Third, it appears that Patterson did not give a prior description, so there is nothing to compare to his later description. Fourth, Patterson indicated that he was very certain of the identification, and he immediately recognized Walker in the array and in court. Finally, only two weeks transpired between the drug transaction and Patterson's identification of Walker in the photographic array. Given these factors, the totality of the circumstances does not favor excluding the testimony. That the appellants, with no support, find it "implausible" that Patterson would not have seen a photograph prior to the transaction is of little moment and unavailing.

19

D.

The appellants challenge the sufficiency of the government's evidence to convict. The denial of a motion for a judgment of acquittal is reviewed de novo. United States v. Osborne, 514 F.3d 377, 385 (4th Cir. 2008). When the motion is based on a claim of insufficient evidence, "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942).

In support of their argument that there was insufficient evidence to convict, the appellants repeat many of the arguments expounded upon above, and for the reasons given above, we find them to be without merit. The appellants also contest the veracity of Boone, the confidential informant. However, this Court has determined: "We do not review the credibility of the witnesses when we evaluate whether there existed sufficient evidence to support a conviction. Just as the uncorroborated testimony of one witness or of an accomplice may be sufficient to sustain a conviction, the uncorroborated testimony of an informant may also be sufficient." United States v. Wilson, 115 F.3d 1185, 1190 (4th Cir. 1997) (internal footnote omitted). Moreover, regarding the appellants' argument that Worthington improperly suggested C-Man's identity to Boone prior to Boone's identification of Walker, even if the suggestion were improper,

20

there was still sufficient evidence to support the drug convictions through the testimony of Agent Patterson.

E.

We will next review Frink's firearm conviction. "In reviewing the district court's denial of a motion for judgment of acquittal, we must consider the evidence viewed in the light most favorable to the government and determine whether any rational jury could have found each essential element of the crime charged beyond a reasonable doubt." Wilson, 115 F.3d at 1191. In Wilson, the Court set forth the parameters for sustaining a conviction under 18 U.S.C. § 924(c)(1): "To sustain a conviction under section 924(c)(1), the Government needed to demonstrate that [the defendant] (1) used, or (2) carried, (3) a firearm, (4) during and in relation to a drug trafficking offense." Id.

Frink takes issue with the "in relation to" prong. The Supreme Court has held:

> The phrase "in relation to" thus, at a minimum, clarifies that the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence. . . . Instead, the gun at least must facilitate, or have the potential of facilitating, the drug trafficking offense.

Smith v. United States, 508 U.S. 223, 238 (1993) (internal citations and quotation omitted). Frink argues that the drug sales and the gun sale at issue were not dependent upon each

21

other, and thus the gun sale did not facilitate, or have the potential of facilitating, the drug transaction. He contends that Boone met with him for the sole purpose of purchasing crack cocaine, and during one transaction, Boone simply asked for a gun as a collateral matter, and Frink provided it to him.

Frink relies heavily on Wilson. That case also involved the use of confidential informants by a local police force and the ATF. The informant made two separate drug transactions and two separate gun transactions. During the last transaction, the informant had arranged to purchase drugs, but was also offered a semiautomatic rifle, which he bought instead. The Court held that the "sale of the firearm neither facilitated nor had the potential of facilitating his marijuana sales" because a) the rifle was not exchanged for drugs, b) the seller tried to sell both the rifle and the drugs, c) there was no testimony from the informant that the presence of the rifle influenced his decision to purchase drugs, and d) the informant freely chose to purchase the rifle instead of the drugs. Wilson, 115 F.3d at 1191-92.

There are significant differences between this case and Wilson. First, when Boone bought the gun from Frink, he did not pay the amount in full, but promised to do so during a future transaction. Second, when Boone was setting up the third and fourth transactions, he repeatedly asked for both guns and drugs. From both of these actions, a reasonable jury could

22

infer that the guns facilitated the drug transactions: the first action created an incentive—debt collection—for future transactions. This incentive, when combined with Boone's second action, inextricably linked the gun and drug sales. Frink attempts to distinguish his case from United States v. Lipford, 203 F.3d 259 (4th Cir. 2000), by arguing that Boone and Frink had already established a course of drug dealing prior to the gun sale. However, the same thing happened in Lipford, as the gun sale did not occur until after two previous drug sales. Id. at 263-64. Therefore, the Court's reasoning in Lipford applies equally here:

> [A] drug purchaser can often "sweeten the pot," offering to purchase not only drugs, but other illegal goods as well. Where that other illegal good is a firearm, that gun's involvement in the drug transaction is not "spontaneous" or "co-incidental;" on the contrary, the firearm facilitates the drug transaction, making it possible for the drug buyer to get the drug seller to take the risks inherent in selling contraband.

Id. at 267.

In this case, it would be entirely rational for a jury to infer that the gun sales "sweetened the pot" for Frink. Yet, we do not suggest that the "in relation to" prong of § 924(c)(1) may be satisfied automatically whenever a law enforcement agent or informant initiates a gun transaction while also purchasing drugs. Here, however, we are satisfied that there is sufficient

23

evidence to indicate that Frink's gun sale was indeed transacted in relation to the simultaneous drug sale.

III.

The appellants have raised several challenges to their drug and firearm convictions, and we deny each of their claims.[4]  The decision of the district court is hereby affirmed.

AFFIRMED

---

[4] Walker also argues that the district court erred in applying the career offender enhancement to his case because it was not charged in the indictment or found by a jury beyond a reasonable doubt.  However, two problems exist with Walker's reliance on Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

First, the Supreme Court explicitly excluded prior convictions in its decision.  Walker contends that the Court will overturn Almendarez-Torres v. United States, 523 U.S. 224 (1998), the case that Apprendi referenced for the rule.  Time will tell whether the appellants are correct, but until then, Almendarez-Torres remains good law.  United States v. Cheek, 415 F.3d 349, 352-53 (4th Cir. 2005).

Second, and perhaps more fundamentally, Walker's sentence was not increased beyond the statutory maximum.  Walker does not dispute this, but instead simply requests this Court to abandon its precedent for a prognostication on future rulings of the Supreme Court.  We decline to do so.